## JOHN C. KING, Executor, et al., Appellants, v. MAGGIE GILSON et al.

### Division One, November 22, 1905.

1. **WILL: Judgment of Insanity: Presumption of Continuance.** A testatrix adjudged by a court of competent jurisdiction to be insane, prior to the execution of the will, is presumed to continue incapacitated to make a will, and such judgment places upon the proponents the burden of showing that the will thereafter made was made during a lucid interval or after she had been restored to testamentary capacity.

2. ———: ———: ———: **Undue Influence.** But a judgment of lunacy does not create the presumption that a will thereafter executed was the result of undue influence, and an instruction which so declares is error.

3. ———: ———: ———: ———: **Burden.** Nor should an instruction, in any case, put upon the proponents the burden of showing that the will was not the result of undue influence.

4. ———: **Undue Influence: How Shown.** It is not incumbent upon the contestants of a will to show undue influence by direct proof. It may be inferred from facts and circumstances, and may be shown by the relation of the parties, the mental condition of the person whose act is in question, and the character of the transaction.

5. ———: ———: ———: **Facts Justifying Instruction.** The testatrix, at the time the will was executed was 74 years old, and eighteen months before, she had been found by the probate court to be of unsound mind and incapable of managing her affairs, and her sister, who is the principal beneficiary, was active in securing that adjudication, and thereafter testatrix, with the consent of her guardian, lived at the house of her sister, who was the active agent in procuring the execution of the will. She employed the attorney who drew it, and who gave her directions how to proceed to establish testatrix's testamentary capacity. She employed two physicians to attend testatrix with a view of ascertaining her mental capacity, and selected the witnesses to the will, all of whom were strangers to testatrix, and it was executed at her house, in her presence and in the presence of her attorney and witnesses, and in the absence of all others who had any claim upon her bounty. It was an entire departure from a former will executed at a time when testatrix was confessedly in sound mind and body. *Held*, that the court committed no error in submitting to the jury the question whether or not the will was the result of undue influence.

6. ———: **Evidence: Incapacity: Affidavit of Some Legatees.** The affidavit of one of the proponents and beneficiaries of the will, made in the probate court at the time when there was an inquiry as to the testatrix's sanity, in which she stated that testatrix was then insane and incapable of managing her business affairs, cannot in the will contest be introduced in evidence to establish the testatrix's incapacity to make a will, if there are other legatees who were not parties to that affidavit or proceeding. Her admission could not bind the other legatees, and the will cannot be set aside as to her and not as to them.

7. ———: **Instruction as to Heirs.** In view of the provisions of the will in this case, it is *held* that a refused instruction, to the effect that under the Statute of Descents and Distribution, in the absence of a will, the testatrix's estate would go to her next of kin, naming them, might well have been given.

Appeal from St. Louis City Circuit Court.—*Hon. Horatio D. Wood*, Judge.

REVERSED AND REMANDED.

*Kinealy & Kinealy, John M. Wood* and *R. L. McLaren* for appellants.

(1) The will was properly executed. Martin v. Bodern, 158 Mo. 389; Craig v. Craig, 156 Mo. 358. (2)

Mrs. Lack on September 13, 1893, was physically and mentally competent to make the will offered for probate in this proceeding.   Von de Veld v. Judy, 143 Mo. 363; Riley v. Sherwood, 144 Mo. 354; Sehr v. Lindeman, 153 Mo. 286; Cash v. Lust, 142 Mo. 639.   (3)   The reasonableness of the will is strong evidence that the testator had sufficient capacity to make a will when she executed it.   1 Wharton & Stille, Med. Juris. (5 Ed.), sec. 997, p. 805.   (4)   The part of the answer which the plaintiffs or proponents sought to have stricken out and which set up, as defense, the verdict of the probate jury rendered on April 2, 1892, that Mrs. Lack was of unsound mind and incapable of managing her affairs, constituted no defense.   Such a verdict did not render Mrs. Lack legally incapable of making this will.   1 Williams on Executors (7 Am. Ed.), 43; Schouler on Wills, sec. 81, p. 81; Brinkman v. Reuggesick, 71 Mo. 553; Estate of Johnson, 57 Cal. 530; Leggate v. Clarke, 111 Mass. 308; In re Pendleton, 1 Connoly 480; Stone v. Damon, 12 Mass. 488; Williams v. Robinson, 39 Vt. 267; Stevens v. Stevens, 127 Ind. 566; Will of Slinger, 72 Wis. 26; Lucas v. Parsons, 27 Ga. 606; Titlow v. Titlow, 54 Pa. St. 223; Est. of Dyer, 12 Phila. 157; Cook v. Cholmondelay, 2 Mac. & G. 22; Bannatyne v. Bannatyne, 16 Jur. pt. 1, p. 864.   (5)   The court below tried this case on the theory that the verdict in the probate court declaring Mrs. Lack of unsound mind raised a presumption that she was incapable of making a will but subject to rebuttal by proof that she made the will in a lucid interval.   This court, however, has held that an adjudication of unsound mind in the probate court is not to be considered in determining whether a person has capacity to make a will.   Such an adjudication does not raise a presumption of incapacity for that purpose.   Brinkman v. Rueggesick, 71 Mo. 555.   (6) The court erroneously admitted the affidavit of Ida A. King.   Wood v. Carpenter, 166 Mo. 465; Schierbaum v. Schemme, 157 Mo. 17.   (7)   The expert testimony

of defendant's witnesses, Runge and Bauduy, as to Mrs. Lack's mental condition and her incapacity to make a will, was erroneously admitted and should have been struck out in compliance with proponents' motion. Senn v. Railroad, 108 Mo. 150; Turner v. Haar, 114 Mo. 345; Lorts v. Wash, 175 Mo. 487; Mammerberg v. Railroad, 62 Mo. App. 567; Rogers on Expert Test. (2 Ed.), 70; Barbers' App., 63 Conn. 393, 22 L. R. A. 90; Briggs v. Railroad, 52 Minn. 36; Davis v. State, 35 Ind. 496; Prentiss v. Bates, 88 Mich. 567; Burgo v. State, 26 Neb. 639; Bertram v. Railroad, 154 Mo. 639; Haish v. Munday, 12 Ill. App. 539; People v. Brown, 53 Mich. 531; State v. Palmer, 161 Mo. 175; 1 Wharton & Stille's Med. Jur. (5 Ed.), sec. 73, p. 76. (8) There is no presumption of undue influence having been exercised on Mrs. Lack to cause this will to be made by her. 29 Am. and Eng. Ency. Law (2 Ed.), 114, 119, 120; Lorts v. Wash, 175 Mo. 487. (9) There was no evidence that this will was executed under undue influence, but strong evidence was adduced against it which was not contradicted or impeached, and the question of undue influence ought not to have been considered by the jury on a presumption of undue influence, in the face of that strong uncontradicted and unimpeached evidence against it, even if any such presumption existed. (10) Instruction 1, on the value of medical expert testimony, asked by plaintiffs and refused by the court ought to have been given. Wilcox v. State, 94 Tenn. 106; Templeton v. People, 3 Hun 357; State v. Miller, 9 Houst. (Del.) 564; Clark v. State, 12 Ohio 483; Haeight v. Vallet, 89 Cal. 245; Green v. Teriwiliger, 56 Fed. 384; Buxley v. Buxton, 92 N. C. 479; Tracy Peerage Case, 10 Clark & F. 154; Wharton on Crim. Ev., sec. 420, cited in State v. Dunn, 179 Mo. 116. And such is the only conclusion that can be arrived at from the decisions in this State as to the value of such evidence in cases of insanity. State v. Palmer, 161 Mo.

171; State v. Dunn, 179 Mo. 116; State v. Soper, 148 Mo. 236; Riley v. Sherwood, 144 Mo. 360.

*Isaac H. Orr, William H. & Davis Biggs* and *Benjamin H. Charles* for respondents.

(1)   The burden of proof was on the proponents of the document dated September 13, 1893, to establish the existence of a lucid interval at that time.   (a) If the proof of insanity consists in the decree or judgment of a competent court declaring the testator to be *non compos mentis* and placing him under guardianship, the presumption is, and continues, until there be a decree or judgment by a competent court declaring his restoration, that he is incompetent to make a valid will; although this presumption may be rebutted by proof showing his sanity at the time of executing the will.   Von de Veld v. Judy, 143 Mo. 365; Steele v. Lowe, 93 Mo. 570; Rannels v. Gerner, 80 Mo. 475; Kiehne v. Wessell, 53 Mo. App. 667; Woerner on Administration, sec. 27; Hardin v. Hays, 9 Pa. St. 162; Stone v. Damon, 12 Mass. 504; In re Estate of Johnson, 57 Cal. 529; Hix v. Whittemore, 4 Met. (Mass.) 545; Aubert v. Aubert, 6 La. Ann. 104; Hamilton v. Hamiton, 10 R. I. 538; In re Pendleton, 1 Connoly 480; Lewis v. Jones, 50 Barb. 645; Ferguson v. Leahy, 2 Ark. 412; Saxon v. Whittaker, 30 Ala. 237; Dodge v. Meech, 1 Hag. 612. (b) The general rule sustained by all the cases is that the proponent of the will must overcome the presumption of the continuance of insanity, and this he must do by clear and satisfactory proof. He has the burden of proof to show that the testator was of sound and disposing  mind when he executed the will, and if it appears that the testator has been judicially pronounced insane prior to the execution of the will, the proponent must produce some evidence showing a restoration to sanity other than that arising from

the proper execution of the will.   There must be the clearest proof that reason and testamentary capacity have been restored.   A person under guardianship and having been declared to be insane may make a valid will if it be shown that he was of sound mind at the very time of its execution.   Underhill on Wills, p. 33; Schouler on Wills, sec. 81; Johnson v. Armstrong, 93 Ala. 73; Lucas v. Parsons, 27 Ga. 593; Rush v. McGee, 36 Ind. 69; Chandler v. Barrett, 21 La. Ann. 58; Leonard v. Lee, 14 Pick. 280; Bond v. Pratt, 18 Pick. 115; Jackson v. Jackson, 7 Gill (Md.) 10; Jackson v. Vandergen, 5 Johnson 144; In re Ganzeder's Estate, 14 Pa. St. 417; Christman v. Christman, 16 Ore. 127; Douglas Estate, 162 Pa. St. 567; Manley v. Staple, 65 Vt. 370; Robinson v. Robinson, 39 Vt. 267; 1 Redfield on Wills, 122-133 and 134; Titlow v. Titlow, 54 Pa. St.; Rice v. Rice, 50 Mich. 448; Slinger's Will, 72 Wis. 22.    (2) The proof of a "lucid interval" is a matter of extreme difficulty.   There must be the clearest proof that reason and testamentary capacity have been restored. 1 Woerner, sec. 28; 1 Underhill, Wills, p. 133; Aubert v. Aubert, 6 La. Ann. 104.    (3)   By competency to make a will is meant intelligence sufficient to understand the act testator is performing, the property he possesses, the disposition he is making of it, and the persons  or objects he makes the beneficiaries of his bounty.   Southworth v. Southworth, 173 Mo. 59; Crowson v. Crowson, 172 Mo. 691.   Plaintiffs failed to establish these facts, and the jury so found.    (4)   It is not sufficient, when an insane condition has been established, to prove sanity before and after the day on which the will was made.   The "lucid interval" must be proved at the very time.   Hays v. Hays, supra; Aubert v. Aubert, supra;   Saxon v. Whittaker, supra;  Boyd v. Eby, 8 Watts 70;   Burwell on Insanity, sec. 188-189.    (5) There is abundant evidence to warrant the instruction given by the court involving the question of undue in-

fluence in the execution of the will of Mrs. Lack. If the defect as to the mental capacity appears, the burden of showing that there was no undue influence is on the proponent of a will. Tyler v. Gardner, 35 N. Y. 559; Delafield v. Parish, 25 N. Y. 35; Marsh v. Tyrrell, 2 Hag. 110; Blewitt v. Blewitt, 4 Hag. 463; Lee v. Dill, 11 Abb. 214; Lake v. Ranney, 33 Barb. 49; Bergen v. Udall, 31 Barb. 25; Barry v. Bullin, 1 Curtis 638; Crispell v. Dubois, 4 Barb. 397. (a) Undue influence is ordinarily not susceptible of direct proof. It will be inferred from the nature of the transaction alone, from circumstances surrounding it and from the testator's mental condition. Bradford v. Blossom, 190 Mo. 110; Seaves v. Shafer, 2 Seld. 272; Delafield v. Parish, supra. (b) The facts warranted the court in giving defendants' instruction 4 involving the question of undue influence. Greenwood v. Cline, 7 Ore. 17; In re Hess' Will, 48 Minn. 504. (6) The affidavit of Mrs. King filed in the probate court in the insanity inquiry was admissible in evidence, inasmuch as she took a joint estate with Oscar Brecht, and Mary Brecht under the will of 1893. The acts, admissions or declarations of one of several legatees who take a joint estate under a will are received in evidence against any or all the others to show fraud or undue influence by them or want of mental capacity. Armstrong v. Farrar, 8 Mo. 627; Jackson v. Hardin, 83 Mo. 186; Schierbaum v. Schemme, 157 Mo. 21; 1 Underhill on Wills, sec. 163; In re Shepardson's Estate, 53 Mich. 106; Horn v. Pullman, 10 Hun (N. Y.) 471; 1 Greenleaf, sec. 174; Osgood v. Manhattan Co., 3 Cow. 612; Atkins v. Sanger, 1 Peck. 192; Smith v. Sargent, 2 Hun 107.

BRACE, P. J.—This is a proceeding commenced in the circuit court of the city of St. Louis, on the 5th of April, 1901, to establish, as the last will and testa-

ment of Emilie Lack, deceased, the following instrument in writing, to-wit:

"I Emilie Lack, of the city of St. Louis and State of Missouri, being of sound and disposing mind and memory, do make this my last will, hereby revoking all former wills and codicils:

"1. I give and bequeath three hundred dollars to Finis Lack, son of my former husband.

"2. In consequence of attempts of my nephew, Gus A. V. Brecht, to defraud me out of my property and leave me, in my old age, dependent on him or others if he had succeeded, and because of the behavior of his brothers, my nephews, Frank Brecht and Charley Brecht, towards me, since the death of my husband, it is my will that neither the said Gus A. V. Brecht, Frank Brecht, nor Charley Brecht shall receive any thing from my estate; and as almost my only object and intention in making this will, is to prevent the said Gus A. V. Brecht, Frank Brecht and Charley Brecht from inheriting or obtaining in any manner, any of my property, it is my will and desire that all my property, of every nature and kind, remaining after payment of said three hundred, shall be distributed as provided by law of this State concerning descents and distributions of the estates of intestates, save and except that the said Gus A. V. Brecht, Frank Brecht and Charley Brecht shall not, collectively or individually, receive any of my property whatever, directly or indirectly, and shall not in any way, direct or participate in its administration or distribution.

"3. I appoint John A. King of said city of St. Louis aforesaid, executor of this, my last will, and request that he shall not be required to give any bond as such executor.

"In Witness Whereof, I, the said Emilie Lack, have hereunto set my hand, at said city of St. Louis and

State of Missouri, this 13th day of September, A. D. 1893.

"EMILIE LACK.

"Signed and published and declared by the said Emilie Lack to be her last will and testament, in the presence of us, the undersigned, who, at her request and in her presence and in the presence of each other, have hereunto signed our names as witnesses thereto and unto said will.

"GEO. A. SLATTERY,

"MAURICE A. SMITH."

This instrument was presented to the probate court for probate, and was by said court rejected, and the following instrument in writing admitted by said court to probate as the last will and testament of the said Emilie Lack:

"I, Emilie Lack, nee Brecht of St. Louis, Mo., wife of Rev. Fredk. Lack being in good health, and of sound and disposing mind and memory, but mindful of death, feel it my duty to make and publish this my last will and testament, hereby revoking all other wills and codicils by me at any time made.

"First. I have loaned to my brother, Gus V. Brecht, $2,000, to be used by him during his natural life without interest; on his death it is my will that said two thousand dollars be equally divided between his three sons, Gustav, Frank and Karl (called Charles). The above loan is represented by a certain note of my said brother, dated May 11, 1887, for two thousand dollars, in which these conditions are recited.

"In order that this bequest may be carried out, I hereby give and bequeath to the said Gustav, Frank and Karl Brecht (three sons of Gus V. Brecht), share and share alike, the above-mentioned note of their father for two thousand dollars.

"Second. I give and bequeath to my half sister, Ida King, nee Brecht, wife of John King, of St. Louis,

Mo., my gold watch and chain, my diamond earrings set in black jet, my gold bracelets, but no money as she and her family are well provided for.

"Third.   To the 'Board of Missions of the Cumberland Presbyterian Church,' a benevolent corporation of St. Louis, Missouri, I give and bequeath the sum of five hundred dollars to be passed to the credit of and become a part of the 'Church Erection Fund' of said board.

"Fourth.   I give, devise and bequeath to my beloved husband, Fredk. Lack, with whom I have lived in perfect love and union for many years, all the rest and residue of my estate, real and personal and mixed, wheresoever situated, to be held and enjoyed by him during his natural life, subject, however, to the following conditions:  (1)  He shall pay to my sister, Bertha Alexander, nee Brecht, of St. Louis, Missouri, forty dollars per month during her natural life out of the income of said estate, and  (2)  to my half-brother Oscar Brecht of St. Louis, Missouri, the sum of twenty dollars per month during his natural life out of said income.

"Fifth.   If my said husband should die during the lifetime of said Bertha Alexander or Oscar Brecht, then so much of the property hereby devised and bequeathed to my said husband as remains in his hands undisposed of at the time of his death, shall vest in and become the property of Wm. H. Black, pastor of the Lucas Ave. Cumberland Presbyterian Church of St. Louis, Mo., who shall hold the same in trust for the following uses:

"1.   He shall pay to Bertha Alexander, if living, the sum of forty dollars per month, and to Oscar Brecht, if living, the sum of twenty dollars per month during their respective lives out of the income of my estate in his hands.

"2.   The rest of said income he shall pay to Mag-

gie A. Gilson, nee Lack, or her children, one-half; and the other half to Finis E. Lack, or his children, both of Paducah, Kentucky.

"3. After the death of both Bertha Alexander and Oscar Brecht, said trustee shall convey in fee simple and deliver one-half of all my estate remaining in his hands to said Maggie A. Gilson or her children, and the other half to said Finis E. Lack or his children.

"Sixth. Should my said husband survive both Bertha Alexander and Oscar Brecht, then so much of my estate as remains in his hands undisposed of at the time of his death shall vest in and become the absolute property of Maggie A. Gilson and Finis E. Lack and their children as above expressed.

"Seventh. Should I survive my husband, Bertha Alexander and Oscar Brecht, then it is my will that all my property except the legacies mentioned in the First, Second and Third clauses of this will shall, upon my death, descend to and become the absolute property of the said Maggie A. Gilson and Finis E. Lack or their children in equal parts. The above is because of the love and affection I bear my dear husband and because of the never failing kindness and consideration he has shown me during our happy married life that I have chosen his children and their children as the object of my bounty.

"Eighth. I hereby nominate and appoint Fredk. Lack, my husband, the executor of my last will and testament and request that he be allowed to act, without bond.

"In Testimony Whereof, I have signed and sealed this instrument and in the presence of witnesses published and declared it to be my last will and testament. Done at St. Louis, Missouri, on May 31st, 1887. The word 'theirs' is changed to 'children' in the 5th, 7th, 15th, 17th and 28th lines of the sixth page.

"EMILIE LACK. (Seal).

"The above was signed, sealed and published and declared by above-named Emilie Lack as her last will and testament in our presence, and at her request and in the presence of each other, have hereunto signed our names in witness to her said act, believing her to be of sound and disposing mind.

"ISAAC H. ORR.

"HARVEY L. CHRISTIE.

"I, Emilie Lack, make this as a codicil to the foregoing will, which I have just executed, and direct that in case the said Maggie A. Gilson or Finis Lack, or either of them shall die without leaving children before they receive the benefits of this will, then it is my will that their portion thus left undisposed of shall go to Gustav, Frank and Carl Brecht, my three nephews, in equal parts.

"Witness my hand and seal on May 31st, 1887.

"EMILIE LACK (Seal).

"The above and foregoing instrument was signed and sealed, published and declared by the above-named Emilie Lack as and for her last will and testament in our presence, who in the presence of each other, have hereunto signed our names as witnesses to her act, believing her to be of sound and disposing mind and memory.

"ISAAC H. ORR.

"HARVEY L. CHRISTIE."

After the execution of the will of May 31, 1887, and before the institution of this suit, the said Frederick Lack, Bertha Alexander and Oscar Brecht, devisees therein, and the said John A. King, executor thereof, died; and before the trial in the circuit court the said Ida A. King, originally one of the plaintiffs herein, died, and the suit was revived in the name of her executor, John C. King.

The plaintiffs herein, proponents of the will of September 13, 1893, are John C. King, executor of the

will of Ida A. King, deceased, and Mary Brecht. The defendants are Maggie Gilson, Finis Lack and George H. Bowles, administrator, with the will of May 1st, 1887, annexed; the Cumberland Presbyterian Board of Missions and Church Erection, formerly known as Board of Missions of the Cumberland Presbyterian Church, a corporation, William H. Black, Gus A. V. Brecht, Charles Brecht, otherwise known as Charley or Karl Brecht, Frank Brecht, Charles Brecht, a minor; the city of St. Louis, and Washington University.

On the 26th day of July, 1899, the said Emilie Lack, then being a widow without living parents, died, leaving no brothers or sisters or descendants of brothers or sisters, of either the whole or half blood, surviving her, except the said Ida A. King, who was her sister of the half blood, and plaintiff, Mary Brecht, and defendant Charles Brecht, a minor, who are the surviving children of Oscar Brecht, deceased, a brother of the said Emilie Lack of the half blood, and defendants Gus A. V. Brecht, Frank Brecht, otherwise known as Charley or Karl Brecht, who were the only children of Gustav Brecht, deceased, brother of the whole blood of said Emilie Lack.

On the second day of April, 1892, in a proper proceeding under the statute in the probate court of the city of St. Louis, the said Emilie Lack was found and adjudged to be "a person of unsound mind and incapable of managing her affairs," and, thereafter, to-wit, on the 30th of April, 1892, Charles Scudder, public administrator of said city, was by said court duly appointed guardian of the person and estate of the said Emilie Lack, took charge of her person and estate, and thereafter continued in such charge and control until the time of her death. These facts were set up in the answer of the defendants Gilson and Lack, in connection with the charges that the said Emilie Lack was not of sound mind at the time of the execution of the instru-

ment propounded and that the same was procured by the undue influence of the said Ida A. King and her husband John A. King.

The defendant moved the court to strike out the averments as to this inquisition and guardianship, and their motions having been overruled, this is assigned as error. Errors are also assigned upon the admission of evidence. At the close of all the evidence, the case was submitted to the jury upon the following instructions:

"1. The plaintiffs allege that the paper dated September 13, 1893, purporting to be the last will of Emilie Lack, is her last will; the defendants deny this. The court upon this issue, directs the jury that if they find from the evidence that the deceased, Emilie Lack, at the time of executing said paper writing in evidence before them, was of sound mind, and that said will was not produced by undue influence, as defined in these instructions, they will find for the will, but if they find from the evidence that at the time of the execution of the will the said Emilie Lack had no mind and memory sufficient to understand and comprehend the nature and character of the business in which she was engaged and the objects of the provisions contained in the will, the nature and kind of her property and the persons who were intended to be provided for by her will then the jury will find against the will.

"2. The court instructs the jury that it appears from the finding of a jury and the judgment of the probate court of the city of St. Louis that on the 2nd day of April, 1892, which was prior to the execution of the alleged will here in controversy, the said Emilie Lack was a person of unsound mind, and therefore incapable of making a valid will, and that this condition of mind is presumed to have continued without intermission and to have existed at the time the alleged will was executed. Therefore, the jury is instructed that it de-

volves upon the plaintiffs, who assert the validity of said will, to show by a preponderance of evidence that at the time the alleged will is claimed to have been executed the deceased had either been permanently restored to her reason, or that it was executed during what is called in law a 'lucid interval,' which will be more fully explained in another instruction. And it devolves on the plaintiffs to further show by a preponderance of evidence that the execution of said will was the result of the unbiased volition of the deceased, that is, the deceased was free from any influence exercised over her mind by Ida A. King and John A. King, or any one in their behalf. And the jury are further instructed that the foregoing facts must be clearly established by plaintiffs by evidence, and the jurors are to judge whether the evidence adduced is of the character indicated. And if the jury find that the plaintiffs have failed by their evidence to meet the burden thus imposed on them, the verdict of the jury must be that the will in controversy is not the will of Emilie Lack, deceased.

"3. The court instructs the jury that by the term 'lucid interval' as used in these instructions, is meant that period of time during which the said Emilie Lack had so far regained the possession of her faculties, as to be of sound and disposing mind and memory as defined in these instructions. It does not mean that there has been a simple diminution in her insanity, but that her mind has been temporarily restored to sanity and sufficiently restored to qualify her to make a will as a person of sound and disposing mind and memory.

"4. If the jury believe from the evidence that the testator, Emilie Lack, was an old woman of weak, disordered intellect, so weak from any cause as to subject her to the control or influence of those with whom she lived; and the jury find that they or any of them exer-

cised such influence and control over her mind in the disposition of her property as to destroy her free will, and cause it to be made to suit their wishes, and not hers, this is such an undue influence as will invalidate her will.

"Before the jury can find that the will in controversy is invalid by reason of undue influence exercised over the testator, they must be satisfied from the evidence that a dominion over the free will of the testator was acquired by destroying her free agency and constraining her to do against her free will what she was not able by reason of such influence to resist, and that this influence was operating upon the testator at the time of the execution of this will.

"5.   To sustain the will it is not sufficient that Emilie Lack at the time of its execution had sufficient mind and memory to answer familiar questions, but she must have had a disposing mind and memory sufficient to enable her to comprehend and understand the character and amount of her property and the persons and objects intended to be provided for by her will and their relations to herself.

"6.   The court instructs the jury that although they should find from the evidence that Emilie Lack at the time of signing the instrument of date September 13, 1893, offered in evidence, or subsequent or prior thereto had a defective memory, such defect of memory did not disqualify her from making a will.

"7.   The testimony of the experts is not binding upon the jury but should be considered by the jury like the testimony of other witnesses, in connection with all the facts given in evidence and given such weight as you consider it entitled to receive.

"8.   The words 'sound and disposing mind and memory' as used in these instructions, mean a mind sufficient to enable a testator to understand what business she was engaged in while she was making and exe-

cuting a will; also to enable her to know who were the natural objects of her bounty, and her relation to them and what property she had and the disposition she desired to make of it. And if the jury shall find from the evidence that Emilie Lack at the time she executed the instrument in evidence had sufficient mind and memory to understand that she was engaged in making a will, knew who her relatives were, and understood what disposition she wanted to make of her property, then she possessed a sound and disposing mind and memory and sufficient capacity to make a valid will.

"9. The court instructs the jury that Emilie Lack, in making her will, had the right to dispose of her property as she pleased, and to give all or so much thereof to any one of her relatives or descendants to the exclusion of the others as she saw fit or deemed proper; and although the jury may believe from the evidence that she made an unequal distribution of her property by her will, and cut off some with nothing or but little who seemed to have as strong claim on her generosity as others who fared better, such facts are not evidence of undue influence and raises no presumption of the invalidity of the will; provided the jury find that while making the will she had a sound and disposing mind and memory."

The instructions numbered from 1 to 7, inclusive, were given by the court on its own motion and at the request of defendants. Instructions numbered 8 and 9 were given at the request of plaintiffs. These were all the instructions given except one on the credibility of witnesses, and one on the form of the verdict, which need not be set out. The court refused to give fourteen instructions asked by the plaintiffs, and error is assigned in refusing to give these instructions, and in giving instructions numbered 2, 3, 4 and 5 hereinbefore set out. The jury returned a verdict that the paper writing, dated September 13, 1893, propounded, is

not the last will and testament of Emilie Lack, deceased, and it was accordingly so adjudged, from which judgment the plaintiffs appeal.

I.    It is contended for the plaintiff that the court erred in refusing to strike out that part of the answer of defendants Gilson and Lack, setting up the adjudication in the probate court, that Mrs. Lack was of unsound mind, and in giving instructions numbered 2 and 3, because, as is contended, such an adjudication constituted no defense and does not raise a presumption of testamentary incapacity thereafter; and in support of this contention Brinkman v. Rueggesick, 71 Mo. 554; 1 Williams on Executors (7 Am. Ed.), 43; Schouler on Wills (3 Ed.), sec. 81, and a number of cases from other jurisdictions are cited. This contention is not sustained by the authorities cited and is contrary to the great weight of authority on the subject.

In Brinkman v. Rueggesick the question was not raised or passed upon. In that case a record of some sort showing that one Buschmann had been appointed a guardian of the testator was introduced for the purpose of affecting his credibility as a witness. As to this evidence the court simply said (loc. cit. 558): "The circuit court did not admit it as any proof on the subject of the testator's sanity, but as having a tendency to affect the credibility of Buschmann's evidence. How this could be, does not very clearly appear, since Buschmann had apparently, so far as the proof shows, no interest whatever in the matter one way or the other." This was the extent of the ruling in that case on the subject.

In 1 Williams on Executors (7 Am. Ed.), 43, it is said: "The presumption of law is, that a verdict of a jury under a commission of lunacy, that the party, the subject of the commission, is of unsound mind is well founded, and if the commission remained unsuper-

seded, that the party continued a lunatic to his death. Such presumption, however, may be rebutted and displaced by positive proof of entire recovery or possession of a lucid interval when a testamentary instrument was executed.''

In Schouler on Wills (3 Ed.), sec. 81, it is said: ''The test of testamentary incapacity being in a proper sense *sui generis,* it does not follow that the will of one under guardianship is necessarily void . . . . But in general where a person is placed under a guardianship for positive insanity, the investigation upon which the appointment was based is such as to establish a *prima facie* case that he was, at that date at least, *non compos* and incapable of making a valid will. And the fact of such an appointment, as well as of the testator's continuance under the guardianship, is doubtless a very important one whenever one's will is contested. But such evidence of testamentary incapacity is *prima facie* only and open to explanation by other proof. Such a person may make a valid will, if he be in fact of sound mind at the time of its execution.''

The rule upon this subject is stated by other textwriters as follows: In 28 Am. and Eng. Ency. of Law (2 Ed.), 94: ''It has been generally held that a prior adjudication of insanity raises a presumption of its continuance, thus making a *prima facie* case in favor of the contestant. But the fact that the testator is under guardianship, although it makes a *prima facie* case of incapacity, does not necessarily invalidate his will. And it has been generally held that proof of prior permanent incompetency shifts the burden upon the proponent to prove either that the will was executed in a lucid interval or that the testator's capacity was restored at the time of execution.''

In 1 Woerner's Am. Law of Adm. (2 Ed.), sec. 27: ''If the proof of insanity consists in the decree or judg-

ment of a competent court declaring the testator to be *non compos mentis,* and placing him under guardianship, the presumption is, and continues until there be a decree or judgment by a competent court declaring his restoration, that he is incompetent to make a valid will; but this presumption may be rebutted by proof showing his sanity at the time of executing the will, although the guardianship be unrepealed.''

In 1 Underhill on Wills, sec. 98: ''Accepting the verdict of the majority of the writers, both legal and medical, that a lucid interval may exist even in the case of what, at first, appears to be permanent insanity, and that a will executed during such an interval must be valid, it becomes necessary to inquire what amount and quality of proof are required to show that a lucid interval has occurred. The general rule sustained by all the cases is that the proponent of the will must overcome the presumption of the continuance of insanity, and this he must do by clear and satisfactory proof. He has the burden of proof to show that the testator was of sound and disposing mind when he executed the will. And if it shall appear that the testator had been judicially pronounced insane prior to the execution of the will, the proponent must produce some evidence showing a restoration to sanity other than that arising from the proper execution of the will. There must be the clearest proof that reason and testamentary capacity have been restored.''

On the issue of testamentary capacity instructions numbered 2 and 3 are well within the rule laid down by the text-writers and the numerous cases cited by them, and, while the question in this State has never been directly ruled upon in the appellate courts, there is no reason why the general rule should not prevail here, as our statute goes no farther than to provide that only the contracts of one found to be of unsound mind and under guardianship made without the consent of the

guardian shall be invalid (R. S. 1899, sec. 3682), leaving the testamentary capacity of such an one as it was at common law. Hence, we conclude that the court committed no error in overruling the motion to strike out the aforesaid parts of the answer of defendants Gilson and Lack; and had these instructions been confined to the issue of testamentary capacity, no reversible error would have been found in them. But instruction numbered 2 goes further and upon the fact that Mrs. Lack had been adjudicated to be of unsound mind predicates not only the presumption of testamentary incapacity at the time of the execution of the will, but the further presumption that the will was procured by undue influence, and devolved upon the plaintiffs the burden of proving not only that the will was the product of a sound mind, but the further negative proposition that it was *not* procured by *"the influence"* (undue or legitimate) of "Ida A. or John A. King or any person in their behalf." Conceding that undue influence was meant in the instruction, this was placing upon the plaintiffs a burden which they were not called upon to bear. The burden of showing undue influence was upon the defendants who asserted that the will was so procured, and in this respect the instruction was erroneous. [Carl v. Gabel, 120 Mo. 283; McFadin v. Catron, 138 Mo. 197.]

II.   While the burden of showing undue influence was imposed upon the defendants, it was not incumbent upon them to show it by direct proof. Undue influence may be inferred from facts and circumstances and may be shown by the relation of the parties, the mental condition of the person whose act is in question, and the character of the transaction. [Bradford v. Blossom, 190 Mo. 110; Doherty v. Gilmore, 136 Mo. 414; Dingman v. Romine, 141 Mo. 466.]

There was ample evidence in the case upon which

to base instruction numbered 4. At the time the instrument propounded was executed Mrs. Lack was about seventy-four years old. About a year and a half before, she had been found to be of unsound mind and incapable of managing her affairs, and, as appears from the evidence, she was easily subject to undue influence. Mrs. King, evidently a woman of strong mind and persistent purpose, was the active agent in securing this adjudication and directly after it was had, Mrs. Lack was, with the consent of her guardian, taken to her house and thereafter continued to live with her. She was the principal beneficiary in this will, the provisions of which were an entire departure from those of the will of 1887, executed when Mrs. Lack was confessedly sound in mind and body. She was also the active agent in procuring the execution of this will. She employed the attorney who drew it and who. gave her directions how to proceed to establish Mrs. Lack's testamentary capacity. She employed two physicians to attend Mrs. Lack with a view of ascertaining her mental capacity and selected the witnesses to the will, all of whom were strangers to Mrs. Lack. It was executed at her house, in her presence and in the presence of her attorney and witnesses, and in the absence of all others who had any claims upon her bounty. And the court committed no error in giving this instruction.

No specific objections are urged to the other instructions given, and we find no error in them; and in view of those given, we find no reversible error in the refusal of the other instructions asked for by the plaintiff. In view, however, of the provisions of the will, instruction numbered 2 refused, to the effect that under the Law of Descents and Distribution, in the absence of a will, the testatrix's estate would go to her next of kin, naming them, might well have been given. Instruction No. 7 upon the weight to be given to expert testimony is in harmony with the rule on the subject in this

State. [Hoyberg v. Henske, 153 Mo. 63.] This brings us to what in our opinion was the most serious error in the trial of the cause.

III. Over the objection of the plaintiffs, the defendants were permitted to introduce as evidence the following affidavit:

"In the matter of Emilie Lack, in the probate court of the city of St. Louis. State of Missouri, city of St. Louis, ss.

"Ida A. King, of lawful age, being duly sworn, upon her oath says, that she is one of the persons who have filed information in this matter; that affiant is the half sister of said Emilie Lack and has been intimately acquainted with her and her business affairs and property for many years past, and that, notwithstanding the recent verdict of the jury in this matter, affiant states it to be her firm and conscientious conviction that the said Emilie Lack was, at the time of the institution of this proceeding, and is now, of unsound mind and incapable of attending to her affairs, and to substantiate her said opinion and the information herein, affiant will, if a new trial is granted, produce, in addition to the testimony given at the former trial, evidence substantially as follows:

"1. Joseph Pohlmeier, W. C. Clark and Rch. M. Scruggs of Scruggs, Vandervoort & Barney, will testify that for a long time and up to quite a recent date they have been acquainted with Mrs. Emilie Lack and have had abundant opportunity to witness her actions and symptoms of her mental condition, and that they are unqualifiedly of the opinion that she is of unsound mind and is incapable of attending to her affairs.

"2. Lena Nunn will testify that she resided as a servant for eight months before and during February of the present year, in the same house with said Emilie Lack and was thrown in daily contact with her, and that

during all that period the said Emilie Lack was of unsound mind and was incapable of attending to her affairs.

"3. Finis Lack, son of the deceased husband of the said Emilie Lack, will testify to his opportunity of knowledge on the subject and that he is of the opinion that she is of unsound mind and incapable of attending to her affairs, and he was not present at the former trial because he was of the opinion that the matter would not be contested.

"4. Frank Weller, a stenographer, Henry Andreas, real estate agent, and Dr. Bahrenburg, a practicing physician, will testify that only a few days before the filing of the information herein, they called upon, and had an extended interview with the said Emilie Lack in regard to herself, her acquaintances and her property, and that in said conversation she showed a complete and painful inability to recognize persons with whom she had been long and well acquainted, and could not tell the number or location of the few houses owned by her; and by her conduct and conversation on that occasion said witnesses were convinced that she was of unsound mind and incapable of attending to her affairs.

"5. That by documentary evidence and witnesses it will be satisfactorily shown that about one year ago the husband of the said Emilie Lack died, leaving a considerable estate, consisting principally of houses in this city and from which a handsome annual income was received; that the said Emilie Lack qualified under the will as administratrix without bond and by virtue of such trust had control of the entire estate of the said deceased, and also had an estate of her own of the value of at least $20,000 and consisting principally of houses in this city, which were realizing handsome rentals; that she is now and has continually been unable to give any satisfactory account of her own or her husband's property and is uninformed as to the amount or dispo-

sition of the proceeds of the same; that as a matter of fact said rentals, etc., were collected and retained by one Gustave A. Brecht, a nephew of the said Emilie Lack, and she had no knowledge concerning the same.

"6. It will further be proved that on the 23rd day of January, 1892, the aforesaid Gustavus A. V. Brecht, caused a deed to be prepared, conveying absolutely the entire estate of the said Emilie Lack to one Anthony E. Nunn, a clerk and a friend of the said Brecht, for the stated consideration of the sum of $14,000 by said deed acknowledged to have been paid the said Emilie Lack by the said Nunn, and on the 1st day of February, 1892, the said Brecht caused her to go before a notary public with him and to execute said deed; that as a fact said Nunn paid no money or other consideration for said conveyance, and shortly thereafter sold said property to a purchaser for the sum of $16,500 in cash and secured notes, and delivered the same to the said Brecht; that said property was assessed at about $15,000, and was worth in the market about $20,000; that friends and relatives asked the said Emilie Lack about said sale of all her property, and she was in the most complete ignorance of having signed any deed or having sold any property whatever; that thereafter the relatives of the said Emilie Lack compelled the said Brecht to disgorge a portion of his wrongfully acquired wealth by executing his promissory note for $16,500, secured by a deed of trust for the benefit of the said Emilie Lack.

"7. That the said Emilie Lack is about 73 years of age, and that mental weakness and alienation is a family infirmity in advanced years, as is evidenced by the fact that a deceased brother and sister in old age became and remained mentally unsound and incapacitated.

"8. That the most distinguished medical experts on nervous diseases will on oath declare the symptoms of the said Emilie Lack to clearly and unquestionably

show unsound mind and incapacity to attend to business.

"Affiant further states that she and those engaged with her in this prosecution, did not at the former hearing present the aforesaid facts, and failed to present their complete case, because the aforesaid Gustavus A. V. Brecht induced them to believe that the matter would not be contested, and begged that his aforesaid fraudulent sale of the old lady's property should not be exposed; and the promptings of kinship induced them to desist from unnecessarily staining the reputation of the aforesaid Brecht, and the same instinct and delicacy caused them to desist from exposing the mental infirmity that had marred the family history.

"Affiant would further show that the said Emilie Lack is residing in the same house with the aforesaid Gus. A. V. Brecht and is completely under his control and on account of her advanced years and mental weakness, is as subject to his manipulation and handling as would be a mere child, and it is necessary that her property rights be taken from her control in order that he may not again wrongfully and fraudulently divest her of her entire estate.

"IDA A. KING.

"Subscribed and sworn to before me this 26th day of March, 1892.

"C. C. COWAN,

"Notary Public City of St. Louis."

Under the will in question Ida A. King, half-sister of the testator; Mary Brecht and Charles Brecht, children of Oscar Brecht, her brother of the half blood, took her entire estate, except the small legacy to Finis Lack. Mrs. King's admission could not bind the other legatees under the will, for, as was said per MARSHALL, J., in Wood v. Carpenter, 166 Mo. l. c. 485: "They could not be admitted as against her and not as to them, for the simple reason that if they had the effect to set aside the

will as to her it would set aside the will as to the other legatees, also. In this respect a will contest is unlike an ordinary suit where separate judgments may be entered as to each defendant, and the admission of one defendant can therefore be limited to himself without injuriously affecting the other defendants.'' The case of Armstrong v. Farrar, 8 Mo. 628, upon the authority of which it was contended this evidence was admissible, was overruled in Schierbaum v. Schemme, 157 Mo. 1, in an exhaustive opinion by VALLIANT, J., in which all the cases in this State on the subject are reviewed, and the true doctrine established in harmony with the weight of authority elsewhere and as announced in the subsequent case of Wood v. Carpenter, supra. It is manifest upon the face of this evidence that it was very injurious to the proponents and legatees under the will, and this injury was accentuated by the fact that some of its statements not shown by other testimony were woven into the web of the hypothetical questions upon which the defendant's experts predicated their opinion that the testatrix at the time of the execution of the will was afflicted with a form of incurable *senile dementia* that could have no lucid intervals. This evidence was not only vicious in itself, but vitiated the hypothetical questions into which it entered, and the objections to both ought to have been sustained. Some other objections are made to the action of the court on the admission of evidence, as to which it is only necessary to say, that we think the court erred in refusing to admit the record of the probate court upon the inquiry therein, showing that the verdict of the first jury was, that the testatrix was of sound mind. In the admission of the other evidence objected to we find no reversible error.

For the errors noted the judgment of the circuit court will be reversed and the cause remanded for new trial.

All concur.