**Helen HUGENEL and Peggy Hugenel, Plaintiffs–Respondents,**

**v.**

**The ESTATE OF Karl E. KELLER, Deceased, and Dwight Douglas, Personal Representative of the Estate, Defendants,**

**and**

**Patricia Price, Defendant–Appellant.**

No. 18444.

Missouri Court of Appeals, Southern District, Division Two.

Dec. 23, 1993.

John S. Dolence, Sims, Bridges & Dolence, Neosho, for defendant-appellant.

James M. Paul, Paul Law Firm, P.C., Neosho, for plaintiffs-respondents.

GARRISON, Judge.

This appeal is from a judgment entered in a will contest case which was tried to the court without a jury. Respondents (hereinafter referred to as Plaintiffs) filed suit alleging that the testator, Karl E. Keller, did not have the requisite mental capacity to execute the will in question and that the will was the product of undue influence by Karl's appointed guardian, Patricia Price. The trial court found for Plaintiffs with reference to both allegations and declared that Karl died intestate. Patricia Price (hereinafter referred to as Defendant), the sole beneficiary of the will, appeals.

*FACTS*

As a result of injuries sustained in World War II, Karl was "rated insane and incompetent" by the Veterans Administration and in June 1949, as a condition of obtaining V.A. benefits, his mother, Mary A. Keller, was appointed his guardian. The order appointing Mary was titled "Appointment of Guardian for an Insane Person" and recited a finding that Karl was a person "of unsound mind and incapable of managing his affairs."[1]

Mary continued to function as Karl's guardian until her death in 1983, when Karl's sister, Helen Ketchum, was appointed successor guardian. Helen served until her death in July 1990, at which time Defendant was appointed successor guardian. She served in that capacity until Karl's death in June 1991 at age seventy.[2]

1. Under § 458.070 in effect in 1949, upon finding that a person was of "unsound mind and incapable of managing his or her affairs," the court was authorized to appoint a guardian of the person and estate "of such insane person." Section 458.010 in effect at that time defined a "person of unsound mind" or "insane person" as "either an idiot, or a lunatic, or a person of unsound mind and incapable of managing his own affairs."

2. In the Letters of Guardianship issued to Defendant, Karl was referred to as "incapacitated" and "disabled." There is, however, no indication in the record of any formal inquiry into

The attorney who prepared the will in question also represented Mary when she was appointed guardian. He testified that over the years Karl had brought up the subject of a will and said that "some of these days I'm going to make a will." On the day the will was prepared and signed (December 19, 1990), Karl was taken to the attorney's office by Defendant, but she was not present when the will was discussed or signed. The attorney testified that Karl said he wanted a will leaving what property he owned to Defendant. He explained that his other relatives did not visit him, Defendant was taking care of him, and he had a good relationship with her. The will contained an Attestation signed by three witnesses saying, among other things, that "we hereby certify that the said Karl E. Keller, was of sound and disposing mind and memory." It also had a "self-proving" clause, pursuant to § 474.337,[3] whereby each of the witnesses acknowledged to a notary public that "to the best of their knowledge the testator was at the time ... of sound mind, and under no constraint or undue influence."

There was no medical testimony concerning the mental or physical condition of Karl, either at the time of or prior to the execution of the will. The attorney was the only witness who testified about Karl's condition on the day the will was signed. He testified that Karl appeared normal to him, seemed to know the nature and extent of his property and the natural objects of his bounty, and gave no indication that he was under duress or coercion of any kind from anyone.

Defendant did not remember the particular day the will was signed but did testify about Karl and his abilities. According to her testimony, after Karl's father died he moved in with his mother until she died, at which time he moved back to his own separate house on the same property. Karl continued to live alone in that house until his final illness. Defendant moved into a trailer house on the property in July 1990 after her mother died, at which time she was appointed Karl's guardian. She usually prepared his breakfast and evening meals, which he

ate at her home, but he prepared his own noon meals. He spent most of his time watching TV, mowing the yard, caring for his two dogs, and straightening up his home. She testified that Karl selected his own groceries, washed his dishes "when he got ready to," swept his floors, cooked and cleaned on his own, bathed and changed clothes without being told, and cared for his lawn mower, including removing flat tires and getting them aired up or fixed. She gave him a monthly allowance of $150 from his Veterans check and, because of his conservative nature, did not oversee how he spent it. She also said that he recognized some family members when they visited him and that he would occasionally ask about their children; when he was taken to the doctor, he would talk with the doctor on his own, though the doctor would later verify with her whether he was taking his medication (none of which was for any mental condition); he played cards, watched TV and painted with her two granddaughters whose custody had been placed with her; and he also indicated that he was aware that his mother, father, and two sisters were all gone, which she took to mean that he was aware they had died. She did admit there were occasions when Karl would break out in laughter for no apparent reason.

Other lay witnesses testified about their observations of Karl over a period of years. In addition to the testimony of the attorney, Defendant presented the testimony of the owner of a nearby convenience store and trailer park who had known Karl for fifteen years. He testified that Karl would come into the store and buy groceries, cigarettes and occasionally gasoline, and would, himself, count out the money for those purchases. He also testified that Karl knew him by name as well as other customers who frequented the store.

Another witness presented by Defendant was a pastor who saw Karl when he visited Helen Ketchum and, after her death, Defendant and her family. Karl seemed to recognize him each time, would answer his questions, and, although he did not have a lot to

Karl's mental condition when either successor guardian was appointed.

3. All references to statutes are to RSMo 1986, V.A.M.S., unless otherwise noted.

say, gave no indication that he was unfamiliar with his surroundings. His impression was that Karl seemed to have his own ideas and wanted to do things his way. This witness had also changed a gas valve on a heating stove in Karl's home. While that work was being done, Karl referred to the part as a "carburetor," which the witness testified was the term previously used for that type of valve.

A neighbor who had known Karl for eighteen years testified that he was "mentally off" to an extent but he could not quantify it. He was aware that Karl could not read[4] or write[5]. Karl knew the witness's wife by name and also knew other neighbors and carried on conversations with them. He testified that: Karl talked about things he was interested in such as mowing the lawn, gardening and livestock; Karl showed him once how to put a harness on a horse; Karl used a riding lawn mower and knew how to jump-start the mower if the battery was dead; and Karl discussed with him the property he owned and talked about other family members who occasionally came to see him. Karl gave no indication that anyone in the family was making him do things he didn't want to do. He also testified about an instance when Karl accompanied him to a store to buy dog food. When the witness noticed that Karl was purchasing cat food, he pointed that out and was told by Karl that "yeah, that's what I wanted." He later learned that Karl's rabbit, dog and cat all preferred cat food. Additionally, he testified to an occasion when he towed a car on his property with a pickup, during which Karl guided the car, applied the brake, and made statements such as "make sure I've got it in neutral when we take off."

Plaintiffs called other lay witnesses, all of whom were family members, to testify about their observations of Karl. Judy Roy, Karl's niece, testified she had a close relationship with him and had been around him for the last fifteen or twenty years. She said he did not talk in complete sentences and was not able to maintain thoughts very long; he did not seem aware of things except those which were relevant to his personal world; he would start laughing and if asked what was funny he would just look at you; his inappropriate laughter occasionally occurred at funerals, including his mother's; about three months after his mother died he asked where she was; his house was not kept in a clean condition, and he hid money in socks, walls, a footlocker, and the toilet. She admitted that he knew who his family members were; was aware of where he hid his money in the home; knew her name as well as the names of her children, brothers, sisters and her mother; and sometimes asked about her son by name. She found it "difficult" that anyone would say that Karl was able to make a will and "improbable" that he was considered to have that capacity.

Phyllis Miller, another niece (Judy Roy's sister), testified that Karl would not initiate conversations but would answer questions; and he did not read newspapers or magazines, although she admitted she did not know whether he knew how to read. She also testified about his unusual laughter without any outside stimulus. She "never thought he had the mentality to make a will."

Karl Martin, Phyllis's son, testified that Karl's ability to converse was spotty. He remembered occasions when Karl would recall experiences when he was in the Navy but then would start talking about something totally different. He also noted that Karl covered his windows with newspapers. Karl would comply with directions given by his mother or his sister without objection; would recognize him and say hello; and knew his mother, sisters, brothers, and cousins at family gatherings. He never asked Karl about his property or whether he wanted to make a will, and he did not see him in December 1990 and therefore did not know what state of mind he was in or how he was getting along.

Finally, Karl's niece, Monna Rice, testified that she saw him once or twice a week over a period of five years while his sister Helen was caring for him. On one occasion he forgot that he had just seen her recently. She admitted that three months after the will

---

4. The attorney testified that he read the will to Karl before it was signed.

5. Apparently, Karl was able to and did sign his will.

was made, in March 1991, he knew her, knew her children, and her sisters and brothers, as well as most family members.

There was also testimony from several of the witnesses that Karl was not aware of current events; he kept his bed in front of the door to his room to keep people out at night; and he kept a footlocker by his front door "to keep the enemy from getting to him while he was asleep." Several witnesses testified, however, that he seemed to know that he owned his furniture, house and tractor.

## ISSUES

Defendant raises five issues, the first three of which may be summarized as: (1) the trial court erred in finding that Karl did not have testamentary capacity because of a presumption of incompetency pursuant to § 475.078, based upon the prior appointment of a guardian; (2) the trial court erred in requiring Defendant to overcome a presumption of incapacity as a result of Karl's earlier adjudication as an incompetent, rather than permitting her to make a prima facie case based upon the "self-proving clause in the will" and shifting the burden of proof to Plaintiffs; and (3) the trial court erred, under the evidence, in finding that Karl lacked testamentary capacity. The other two points concern the court's finding of undue influence, but since we have concluded that we must affirm the trial court's finding that Defendant failed to sustain her burden to show Karl had testamentary capacity, we need not discuss them.

## OPINION

▪ The standard of review which we are required to apply in court-tried cases is of particular significance in the instant appeal. We are required to affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *Moyer v. Walker,* 771 S.W.2d 363, 365 (Mo.App.1989). Due regard must be given to the opportunity of the trial court to judge the credibility of witnesses and, accordingly, it is entitled to believe all, part, or none of any witness's testimony. *Kaiser v. Pearl,* 670 S.W.2d 915,

918 (Mo.App.1984). The power to set aside a judgment on the ground that it is "against the weight of the evidence" must be exercised with caution and only with the firm belief that the decree or judgment is wrong. *Murphy v. Carron,* 536 S.W.2d at 32. Great deference must be given to the trial court's resolution of conflicts in evidence and we may not substitute our judgment on those matters. *Linnenbrink v. First National Bank,* 839 S.W.2d 618, 620–21 (Mo.App.1992). The existence of evidence from which another conclusion might have been reached is not enough to demonstrate that the holding of the trial court is contrary to the weight of the evidence, in that we are required to take the facts in accordance with the result reached. *Moyer v. Walker,* 771 S.W.2d at 365–366.

The first two of Defendant's points relied on relate to the trial court's acceptance of a presumption of incapacity by reason of Karl having earlier been adjudicated an incompetent. She first argues that the trial court erred in finding that Karl lacked testamentary capacity on the basis of such a presumption. Secondly, she contends that the trial court was wrong in requiring her to respond to and overcome the presumption of incapacity, rather than accepting the self-proving clause of the will as a prima facie showing of testamentary capacity and shifting the burden of proof to Plaintiffs.

In its written judgment entry, the trial court found that Karl lacked the "requisite testamentary mental capacity to execute such will at the time of its making," and further said:

The Court further finds that said decedent was incompetent at the time the said document was executed having been found incompetent by order of the probate court initially in 1949 and through a series of succeeding guardianships and conservatorships, the last successor guardian having been the Defendant, Patricia Price who was appointed guardian of the decedent on the 16th day of July, 1990 in Probate Case # CV583–138P.

In making this determination, the Court is aware of the statutory presumption that the decedent was in fact incompetent at

the time of making the will as the presumption is stated under 475.078(3) RSMo. In addition, the Court is also mindful of the fact that the testimony indicated that the decedent was unaware of the nature of his estate or the particular items of property and value of the property that he held title to and that the decedent had evidenced difficulty comprehending the reality of nature and the natural proceedings of death.

The Court finds that the Defendants had the burden of proof to overcome the presumption of incapacity and from the evidence presented at trial that such burden of proof was not met by Defendants.

Section 475.078(3) provides, in part: "A person who has been adjudicated incapacitated or disabled or both shall be presumed to be incompetent."[6]

■■ Testamentary capacity exists if, at the time the will was signed, the testator was of sound mind, understood the ordinary affairs of life, knew the nature and extent of his property, knew the persons who were the natural objects of his bounty, and appreciated his natural obligations to those persons. *Lewis v. McCullough*, 413 S.W.2d 499, 505 (Mo.1967); *Moyer v. Walker*, 771 S.W.2d at 367. The test is the testator's ability "to comprehend and understand the ordinary, as distinguished from the intricate and complicated affairs of life." *Ahmann v. Elmore*, 211 S.W.2d 480, 488–489 (Mo.1948) (quoting from *Berkemeier v. Reller*, 317 Mo. 614, 643, 296 S.W. 739, 752 (1927)). The testator's condition before the execution of the will has no probative value, unless it raises a reasonable inference as to that person's mental condition when the will was signed. *Glover v. Bruce*, 265 S.W.2d 346, 352 (Mo.1954).

■■ In the instant case, Defendant seeks to avoid the presumption of incompetency provided in § 475.078(3) by arguing that there is a distinction between incompetency under the guardianship statutes and testamentary capacity. We agree that it is possible for a person under guardianship to have sufficient testamentary capacity to make a will. As stated in 79 Am.Jur.2d Wills § 58:

The general rule is that the mere fact that an adult is under guardianship does not deprive him of the power to make a will.... One's mental powers may be so far impaired as to incapacitate him from the active conduct of his estate, and to justify the appointment of a guardian for that purpose, and yet he may have such capacity as will enable him to direct a just and fair disposition of his property by will.... However, an adjudication of incompetency or lunacy in a proceeding for the appointment of a guardian is evidence of testamentary incapacity and is held by some courts to establish a prima facie case of incapacity to make a will.

Section 475.078(3) does not specifically provide that a person under guardianship is incapable of making a will. Rather, it provides that someone who has been previously adjudicated to be incapacitated or disabled shall be presumed to be "incompetent." The present version of § 475.010 does not define "incompetent,"[7] but does define, in subsection (8), an "incapacitated person" as:

... one who is unable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions to such an extent that he lacks capacity to meet essential requirements for food, clothing, shelter, safety or other care

**6.** We also note that § 475.016 provides, in part:
If there has been an adjudication of incompetency before September 28, 1983, any person so adjudicated shall be deemed totally incapacitated and totally disabled as defined in section 475.010, until such time as the probate division of the circuit court ... upon the annual review proceeding prescribed by section 475.082 or otherwise, may review the nature of the incapacity or disability of the person so adjudicated and alter the nature of the adjudication if, as a consequence of the review, it appears to the court that the person is not both

totally incapacitated and totally disabled as defined in section 475.010.
No review of the nature of Karl's incapacity or disability is indicated in the record before us.

**7.** Under an earlier version of § 475.010 adopted in 1955, the term "incompetent" was defined as "any person who is incapable by reason of insanity, mental illness, imbecility, idiocy, senility, habitual drunkenness, excessive use of drugs, or other incapacity, of either managing his property or caring for himself or both."

such that serious physical injury, illness, or disease is likely to occur.

Therefore, a person may be "incapacitated" for physical reasons which, under the statute, would create a presumption of incompetency but which has no relationship to testamentary capacity. As stated in *Ahmann v. Elmore*, 211 S.W.2d at 486:

> The law is that a testator who is partially insane or a monomaniac may make a valid will providing the partial insanity does not enter into the disposition of his estate.

Plaintiffs cite, however, *King v. Gilson*, 191 Mo. 307, 90 S.W. 367 (1905), which holds that there is a rebuttable presumption of testamentary incapacity from the showing of an existing guardianship. There, the testatrix had been adjudicated as "a person of unsound mind and incapable of managing her affairs." The court held that such an adjudication created a prima facie showing and rebuttable presumption that the condition continued and the person was incapable of making a valid will. The court quoted with approval from other writers, saying at 90 S.W. at page 371:

> ... The test of testamentary incapacity being in a proper sense sui generis, it does not follow that the will of one under guardianship is necessarily void. * * * But, in general, where a person is placed under a guardianship for positive insanity, the investigation upon which the appointment was based is such as to establish a prima facie case that he was, at that date at least, non compos and incapable of making a valid will. And the fact of such an appointment as well as the testator's continuance under the guardianship, is doubtless a very important one whenever one's will is contested. But such evidence of testamentary incapacity is prima facie only, and open to explanation by other proof. Such a person may make a valid will, if he be in fact of sound mind at the time of its execution.

*See also Boeving v. United States*, 493 F.Supp. 665, 668 (E.D.Mo.1980), reversed on other ground, 650 F.2d 493 (8th Cir.1981). This reasoning is consistent with 79 Am. Jur.2d Wills § 153, which states:

> An adjudication of insanity is prima facie evidence of testamentary incapacity where

it precedes the execution of the will. In such a case, continuance of insanity will be presumed and the onus cast upon the propounders of the will to show that the disqualification had been removed.... An adjudication of insanity, moreover, is only presumptive, not conclusive, evidence of testamentary incapacity, whether made before or after the execution of the will.

 The trial court, therefore, did not err in holding that a presumption of testamentary incapacity arose in the instant case. In addition, we are unable to agree with Defendant's premise in her first point that the trial court based its finding of testamentary incapacity on the existence of that presumption. The trial court found not only that Defendant failed to overcome the presumption but also that the evidence otherwise indicated a lack of testamentary capacity. There was evidence in the record which could support that conclusion. As stated earlier, we should not substitute our judgment for that of the trial court concerning credibility issues or the weight to be given evidence.

Defendant also contends that the trial court erred in requiring her to overcome the presumption of incapacity rather than requiring Plaintiffs to overcome a prima facie case of testamentary capacity which, she argues, was established by the self-proving clause in the will. As we understand this point, Defendant argues that the self-proving clause of the will (which, by reason of § 473.065, is entitled to be admitted to probate without further proof) constituted a prima facie case of due execution and testamentary capacity which has the effect of shifting the burden of proving lack of testamentary capacity to the Plaintiffs. She seems to argue that once she made that prima facie showing no additional evidence should have been required of her.

 The proponent of a will has the burden of proof concerning testamentary capacity of the testator. Once the proponent makes a prima facie case showing due execution and attestation of the will as provided by statute and that the decedent was of sound and disposing mind when the will was signed, the contestants must then produce substan-

tial evidence to overthrow the prima facie case and to prove that the testator lacked sufficient mental capacity. *Lewis v. McCullough,* 413 S.W.2d at 504–505. *See also Wright v. Kenney,* 746 S.W.2d 626, 631 (Mo. App.1988); *Keifer v. St. Jude's Children's Research Hospital,* 654 S.W.2d 236, 237 (Mo. App.1983). The burden of proof, however, remains with the proponent of the will throughout the case. *Brug v. Manufacturers Bank & Trust Co.,* 461 S.W.2d 269, 276 (Mo. banc 1970).

There is some indication that the self-proving clause contained in the will may not have any effect beyond expediting admission to probate. Section 474.337, authorizing the self-proving clause, is modeled after § 2–504 of the Uniform Probate Code. The official comment following that section states:

> A self-proved will may be admitted to probate as provided in Sections 3–303, 3–405 and 3–406 without the testimony of any subscribing witness, but otherwise it is treated no differently than a will not self-proved.

■ Assuming, without deciding, that the self-proving clause of the will provides a prima facie showing of not only due execution but also testamentary capacity, Defendant's argument ignores the existence and effect of the presumption created by the existence and continuation of Karl's guardianship. Certainly the presumption of incapacity created by Karl's original adjudication as an insane person (which included a finding that he was "a person of unsound mind and incapable of managing his affairs"), together with the later appointments of successor guardians for him as an incapacitated and disabled person, satisfied the requirement that Plaintiffs come forward with substantial evidence of testamentary incapacity. Significantly, as indicated earlier, the burden of proof on the issue of testamentary capacity remained with Defendant, as proponent of the will, throughout the trial.

In *King v. Gilson,* 90 S.W. at 372, the court said:

> ... The general rule sustained by all the cases is that the proponent of the will must overcome the presumption of the continuance of insanity, and this he must do by clear and satisfactory proof. He has the burden of proof to show that the testator was of sound and disposing mind when he executed the will. And, if it shall appear that the testator had been judicially pronounced insane prior to the execution of the will, the proponent must produce some evidence showing a restoration to sanity other than that arising from the proper execution of the will. There must be the clearest proof that reason and testamentary capacity have been restored.

The trial court did not, therefore, err in applying a presumption of incapacity based upon Karl's continuing guardianship and, in effect, requiring Defendant to carry the burden of proof on the issue of testamentary capacity throughout the trial. Certainly, we are not able to reverse this judgment on the basis that the trial court required Defendant to overcome the presumption of incapacity rather than permitting her to prevail solely on the basis of the self-proving clause of the will.

Defendant also alleges that the trial court erred in finding that Karl lacked testamentary capacity when the will was executed based upon its findings that he was unaware of particular items of his property or value of his property and had evidenced difficulty comprehending the reality of nature and the natural proceedings of death. The judgment leads the reader to the inescapable conclusion that the trial court found that Defendant failed to sustain her burden of proving that Karl had testamentary capacity when he signed the will, and that she failed to overcome the presumption of incapacity created by the earlier appointment of a guardian. Because the trial court was free to believe or disbelieve the witnesses, and because we are unable to substitute our judgment on the credibility issues, we are constrained to affirm this judgment. This is true even though there is evidence in this case which, had the trial court found it persuasive, would have supported a different result.

Judgment affirmed.

FLANIGAN, P.J., and CROW, J., concur.