Dudley EVANS, Wanda Jackson, Thelma Dotson, Jewell Millard, Sally Ann Epperson, Shirley Evans, Ronnie Evans, Harold Evans, and Glen Evans, Plaintiffs–Respondents,

v.

Judy STIREWALT, Janet Webster, Vivian Cole, and Carl Evans, Defendants–Appellants.

No. 26322.

Missouri Court of Appeals, Southern District, Division Two.

March 31, 2005.

---

Timothy D. Richardson, Springfield, for appellants.

Philip J. Metz, Joplin, for respondents.

KENNETH W. SHRUM, Judge.

This is a will contest case. The trial court ruled Amy Carlisle ("Amy") lacked testamentary capacity to make a will and, therefore, was deemed to have died intestate.[1] The proponents of the will ("Defendants") appeal.[2] This court affirms.

## STANDARD OF REVIEW

In a court-tried will contest case, appellate review is governed by Rule 84.13(d).[3] We are obliged to affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Moyer v. Walker*, 771 S.W.2d 363, 365[2] (Mo.App.1989) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976)).[4]

---

1. We refer to decedent Amy Carlisle as "Amy" in the hope it will aid the reader in following the facts. This court intends no disrespect.

2. Defendants are persons named as legatees or devisees under Amy's last will. Plaintiffs are nephews and nieces of Amy not named in her will.

3. All rule references are to Supreme Court Rules (2004), unless otherwise stated.

4. *Murphy* interpreted the provision of former Rule 73.01(c). The requirements of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

As to issues of fact, we exercise the power to set aside a judgment because it is against the weight of the evidence "with caution" and only when we have a "firm belief that the decree or judgment is wrong." *Murphy*, 536 S.W.2d at 32. "The mere existence of evidence from which another conclusion might have been reached is not enough to demonstrate that the holding of the trial court is contrary to the weight of the evidence." *Moyer*, 771 S.W.2d at 365–66[3]. All evidentiary conflicts are for the trial court to resolve, and we take the facts according to the result reached. *Id.* In the same vein, we defer to the trial court's determination of witness credibility and recognize that the court is free to accept or reject all, part, or none of the testimony presented. *Christian Health Care v. Little*, 145 S.W.3d 44, 48[5] (Mo.App.2004); *Cockrum v. Cockrum*, 550 S.W.2d 202, 205[2] (Mo.App.1977).

## FACTS

The following summary of the evidence heeds the principles set out above. The challenged will was prepared by attorney James Fleischaker ("Fleischaker"). Amy, born January 31, 1914, signed the will August 10, 2000. At the time, Amy was widowed—her husband of many years died May 1998—and she had no children or other lineal descendants. Her nearest relatives were nephews, nieces, grandnephews, and grandnieces.

Amy's August 10 will (the contested one) was the last of fourteen wills (plus one codicil) prepared for Amy between May 20, 1998, and August 10, 2000. All made differing dispositions of her property, including bequests and devises to persons other than her nephews, nieces, or their descendants. These documents and testimony from lawyers who prepared them showed Amy had a history (after her husband died) of befriending people, asking for their help, making provisions for such persons via wills and codicils, giving them powers of attorney, and then quickly turning against them and revoking the wills and other documents.[5]

In April 2000, Amy fell in her garage and lay there for several hours before she was discovered. As a result, she was hospitalized. While there, Amy asked lawyer Tomie Kay Parsons ("Parsons") to visit her.[6] Parsons was a neighbor and visited in Amy's home on occasion. She also drafted four wills and some powers of attorney for Amy between May 1998 to April 1999.

Parsons testified she had witnessed Amy's "mental state" progressively deteriorate after 1998. Parsons' visit with Amy at the hospital in April 2000 convinced her that Amy lacked testamentary capacity; consequently, she refused Amy's request to prepare another will.

Once Amy left the hospital in April 2000, she consulted another lawyer, Max Glover ("Glover"), regarding will preparation.[7] On May 9, 2000, Glover prepared a will for Amy that divided her estate equally between the Salvation Army and the American Heart Association. By the very next day, Amy had changed her mind and asked Glover to make a will with three money

---

5. Sometimes, Amy made provisions for longtime friends and neighbors. In other instances she made provisions for family members or charitable organizations.

6. This person was known as Tomie Parsons during the relevant period of 1998 through 2000. By the time the will contest was tried

April 26, 2004, she was known as Tomie Kay Avant.

7. This was not the only time Glover prepared wills for Amy. He did so on June 24, 1998, May 20, 1999, January 26, 2000, and April 19, 2000.

bequests ($5000 to niece Vivian Cole, $5000 to niece Judy Stirewalt and $5000 to a mentally handicapped acquaintance who lived in the neighborhood). Via the May 10 will, Amy left the rest of her estate to Richard Dooley, a neighbor who had recently begun doing chores for her.

One day later, Amy again contacted Fleischaker about another will. Through the May 11 will, she bequeathed $5000 to her mentally disabled friend, $5000 to niece Vivian Cole, and willed the remainder of her estate to Richard Dooley and his wife. Amy told Fleischaker she had arranged to buy a modular home for the Dooleys, the home was to be moved onto her property, and the Dooleys were then going to help take care of her. This will was signed May 18. As a part of this plan, Amy made a beneficiary deed to Dooley for her real estate on May 23, 2000.

In late May or early June 2000, Amy's grandniece (Judith Brand) petitioned the probate court to have a guardian and conservator appointed for Amy. This was prompted by Amy's May 18 will, her purchase of the modular home for the Dooleys, and the preparations for moving the modular home onto Amy's property.[8]

The guardianship/conservatorship hearing was held July 26, 2000, and Amy was represented by Parsons (as Amy's court-appointed attorney) and Fleischaker (hired by Amy). Amy testified as did the applicant and another family member, Janet Webster (another grandniece). Medical testimony came, in part, via a letter from Dr. Browning, Amy's most recent family physician. Therein, he opined Amy's dementia and cardiovascular disease incapac-

itated her to the point she needed a guardian and conservator.

Additionally, the court considered reports from Dr. Kory, a board-certified psychiatrist. He diagnosed Amy with "bipolar disorder, manic, with psychotic features" and concluded that a guardian and conservator should be appointed for Amy.

When Dr. Kory was later deposed in the will contest case, he provided additional details not found in his written report that was put in evidence at the probate court hearing. Specifically, he explained he first saw Amy in late May 1998 after her husband died. His initial diagnosis was "major depression with associated anxiety." He started her on a regimen of antidepressant medications. Dr. Kory monitored Amy until October 1998, during which time he changed and adjusted her medications. Amy stopped seeing Dr. Kory.

When Amy finally returned to Dr. Kory's office in early May 2000, he learned she was no longer taking the medications prescribed in 1998. Moreover, there were now family concerns that Amy might need a guardian and conservator. He again prescribed an antidepressant medication for Amy and scheduled another visit with her for June 27, 2000. He cautioned, however, that he anticipated "her compliance would be quit [sic] poor."

When Amy returned to Dr. Kory on June 27, he observed unusual speech patterns and behavior. He concluded Amy was suffering from a "bipolar disorder, manic with psychotic features." From his observations of Amy[9] and a review of Amy's recent conduct,[10] Dr. Kory conclud-

---

8. Trees were cut and earth excavations were made on Amy's property as a prelude to placing the modular home there.

9. He noted, *inter alia,* that Amy was "irrational," had "disjointed and rambling" speech,

and was so "angry and irritable" that it was "very difficult to interrupt her."

10. Dr. Kory had earlier been furnished an extensive written history of Amy's recent con-

ed Amy could not "understand the ordinary affairs of her life," or "make decisions in her best interest," or "intelligently appreciate who her heirs would be and what she should do with her finances concerning those people." He opined that a manic stage (such as he saw in Amy on June 27) could go on for weeks, months, sometimes longer, and if she did not take the prescribed medication her symptoms would continue.

Although Dr. Kory did not know if Amy took the medication prescribed on June 27 as she never kept her next scheduled appointment, he had read the report of another psychiatrist who visited with Amy in December 2000. That record revealed (a) Amy was not on the medication Dr. Kory prescribed in June 2000 and (b) many of Amy's symptoms in December 2000 were the same or worse than those Dr. Kory noted in June 2000.

At the conclusion of the July 26, 2000, probate hearing, the judge announced the appointment of two family members as guardians for Amy and appointed the public administrator as conservator. In doing so, he voiced concerns about how to handle the modular home and beneficiary deed issues, i.e., how to handle those transactions.[11]

On August 4, 2000 (ten days after the probate court adjudication), Amy again met with Fleischaker to make another will. He made notes of her wishes and prepared a new will, and on August 10, 2000, Amy signed the will that underlies the filing of this will contest. Amy died March 23, 2002, whereon this suit was filed.

On May 17, 2004, the trial court ruled that Amy lacked testamentary capacity on the day she signed the subject will. Accordingly, the court set aside the will and declared that Amy died intestate. This appeal followed.

## DISCUSSION AND DECISION

Defendants' single point relied on urges reversal on the premise that Plaintiffs evidence was not sufficient to overcome the *presumption* that Amy had sufficient testamentary capacity to make a valid will.

■ In the argument part of their brief, Defendants point out that Amy was only placed under a *limited* guardianship and conservatorship. *See* note 11. Based on that, they insist the rule of law enunciated in *Milum v. Marsh ex rel. Lacey*, 53 S.W.3d 234 (Mo.App.2001)[12], attends here, and that the principles of *Hugenel v. Estate of Keller*, 867 S.W.2d 298 (Mo.App. 1993), are inapplicable.[13] However, we

duct via letter from Janice Tusinger, Jasper County public administrator.

11. Fleischaker requested a limited guardianship and conservatorship, which the court granted. In part, Amy was allowed to vote, but was not permitted to enter into commercial contracts. Moreover, she was to be maintained in the least restrictive environment necessary, i.e., her home.

12. In *Milum*, we held that the admission of a self-proving will to probate provides a prima facie case of testamentary capacity. Accordingly, once the proponent of a will makes a prima facie case by introducing the will into evidence, the burden shifts to the opposing

party to produce substantial evidence to rebut the prima facie case. *Id.* at 238.

13. In *Hugenel*, the testator made a self-proving will per section 474.337, but he had previously been adjudged an insane person and there were later appointments of successor guardians for him as an incapacitated and disabled person. *Id.* at 305. Under those circumstances, we held there was a presumption of testamentary incapacity because of the testator's continuing guardianship; the presumption was such that the defendant proponents of the will had "to carry the burden of proof on the issue of testamentary capacity throughout the trial." *Id.*

need not decide whether the *limited features* of the guardianship and conservatorship trigger the *Milum* rule or *Hugenel* rule. This is so because the trial court ruled that "Plaintiffs bore the burden" of proving Amy lacked testamentary capacity (thus implicitly adopting the *Milum* rationale), yet no one challenged that ruling on appeal. More than that, the court found Plaintiffs presented sufficient substantial evidence to overthrow the prima facie case and prove Amy lacked testamentary capacity. Because the record supports the latter conclusion, the outcome of this case would not be altered even if the trial court erred in its implicit conclusion of law, i.e., that the *Milum* rule governed here.

■ The standard for measuring testamentary capacity is whether, at the time the will was signed, the testator was of sound mind, understood the ordinary affairs of life, knew the nature and extent of his other property, knew the persons who were the natural objects of his other bounty, and appreciated the natural obligations to those persons. *Lewis v. McCullough,* 413 S.W.2d 499, 505 (Mo.1967); *Hugenel,* 867 S.W.2d at 303[5]. The test is the testator's ability "to comprehend and understand the ordinary, as distinguished from the intricate and complicated affairs of life." *Ahmann v. Elmore,* 211 S.W.2d 480, 488–89 (Mo.1948) (quoting from *Berkemeier v. Reller,* 317 Mo. 614, 643, 296 S.W. 739, 752 (Mo.1927)). Evidence of a testator's condition before or after the date he or she signed a will has no probative value on the issue of testamentary capacity *unless* it raises a reasonable inference as to the testator's mental condition at the time he or she executed the document. *Glover v. Bruce,* 265 S.W.2d 346, 352 (Mo. 1954). It is equally well established that the will of a person previously placed under guardianship or conservatorship is not necessarily void. *King v. Gilson,* 191 Mo.

307, 90 S.W. 367, 371 (1905); *Hugenel,* 867 S.W.2d at 303–04.

The only direct evidence concerning Amy's mental condition on the day the will was signed came from Fleischaker. Therefore, there are two questions that must be answered. First, did the evidence about Amy's mental condition, both before and after the execution of the will, raise a reasonable inference as to her mental condition at the time she signed the will? Second, was such evidence sufficient to support the trial court's finding that Amy lacked testamentary capacity on August 10, 2000? We answer both questions in the affirmative.

■ Earlier we recounted parts of Dr. Kory's testimony. The record shows he was licensed in adult psychiatry, with subspecialities of addiction and geriatric psychiatry. He testified that when he saw Amy on June 27, 2000, she lacked all four elements of testamentary capacity and diagnosed her as "bipolar, manic, with psychotic features." He defined psychotic features as "someone who is delusional, suspicious, paranoid, hallucinating, essentially they have lost contact with reality." When asked if on June 27 Amy lost track with reality, Dr. Kory answered, "Yes." He also testified that Amy did not have a "rational thought process ... at that time."

A significant part of Dr. Kory's observations about Amy's lack of testamentary capacity on June 27 was tied to her mental condition on August 10, 2000. This occurred largely through Fleischaker's attrial testimony. For instance, when Dr. Kory saw Amy on June 27 her speech was pressured and rapid with rambling conversation. She was loud, almost to the point of shouting. As he described it, "it was very difficult to get her to focus on anything." When this description of Amy on June 27 was recounted to Fleischaker, he

conceded "there were a lot of similarities between what [he] saw of her in August of 2000 and what Dr. Kory saw of her on June 27, 2000" as far as her unusual speech patterns and behavior.

Moreover, by August 10, Fleischaker had seen Dr. Kory's narrative medical report, knew of Amy's symptoms as observed by Dr. Kory, and knew he had treated her via medication. He also knew of Dr. Kory's concern that Amy would not take the medication. Even so, Fleischaker made no effort to find out if Amy was taking the medicine prescribed and, if so, whether it helped. From the testimony thus recounted, the trial court reasonably could have inferred Amy was still out of contact with reality on August 10, 2000, she had either not taken her medication or it had not worked, and she still lacked testamentary capacity.

Additional evidence that supports the trial court's decision includes Parson's testimony about her observations of Amy in April 2000 and Parson's refusal to prepare a will for Amy because she felt Amy lacked testamentary capacity and probably needed a guardian and conservator. Significantly, Parsons had known Amy for some time, knew her background, and could gauge the degree of deterioration in her mental condition.

In contrast, Fleischaker (who prepared Amy's last two wills) did not know her before May 4, 2000. At trial, Fleischaker admitted that had he known all of the facts in May 2000, they would have sent up a "red flag" for him. He explained: "I don't know if I would have drafted the will, but I would certainly have inquired into her reasons and suggested probably to her that she have a current medical examination before, or at least at the time, that we executed the will." At trial, Fleischaker (via questions from Plaintiffs' lawyer) recounted what he learned about Amy by

August 2000. He was then asked, "Looking back on everything that's been going on, at this point would you question whether ... Amy had testamentary capacity on August 10th, 2000?" Fleischaker answered, "I think that's a legitimate question. I don't, you know, I mean, I assume that's why we're here." Later at trial, he stated he never believed it was a good idea for Amy to have control over her major assets. This part of Fleischaker's testimony buttressed the permissible inference that the trial court drew, i.e., that Amy lacked testamentary capacity on August 10.

In their brief, Defendants point to evidence (including part of Fleischaker's testimony), which if believed, would have supported a finding that Plaintiffs never overcame the prima facie case that Amy had testamentary capacity on August 10, 2000. The short answer to this argument is that the choice of what evidence to believe was the exclusive prerogative of the trial judge and we are required to take the facts in accord with the result reached. *Hugenel*, 867 S.W.2d at 302; *Moyer*, 771 S.W.2d at 365–66.

Defendants also cite and rely on cases holding that evidence of sickness, old age, eccentric behavior, and other infirmities, *taken alone without evidence of the severity of the conditions on the day the will was signed*, will not support an inference of testamentary incapacity. *See, e.g., Bruce*, 265 S.W.2d at 352–53; *Estate of Dean*, 967 S.W.2d 219, 223 (Mo.App.1998). Certainly, those principles are sound, but have no applicability here. This follows because Amy's problems as described by various witnesses did not stand alone. As explained earlier, evidence of her testamentary incapacity on June 27, 2000, was connected to the day she signed the subject will. The connection came through

parts of Fleischaker's testimony. Accordingly, the following is *apropos:*

> "[E]vidence of occurrences and circumstances prior to and closely approaching the time of the execution of the will, and shortly subsequent thereto, which tends to shed light on the issue of testamentary capacity and tends to show the condition of testator's mind at the time of the execution of the will, is competent."
>
> . . . .
>
> "Although sickness, old age, and mere eccentricities are insufficient to nullify a will on the ground of mental incapacity, *each may be taken into consideration with other facts in determining testamentary capacity.*"

*Disbrow v. Boehmer,* 711 S.W.2d 917, 924 (Mo.App.1986) (emphasis supplied).

It is evident the trial court relied on Fleischaker's testimony and the inferences to be drawn from it when entering the judgment. Specifically, the court found that "[w]hen ... other evidence ... [is] coupled with the testimony of ... attorney ... Fleischaker, that [Amy's] symptoms as found by Dr. Kory persisted on the date the Will was executed, August 10, 2000, it is clear [Amy] lacked the requisite capacity to execute a will." Applying the standards recited herein to the facts of the present case in the light most favorable to Plaintiffs, we hold there was substantial evidence to support the trial court's ruling that Amy lacked testamentary capacity when the will was signed on August 10, 2000. The judgment of the trial court is affirmed.

PARRISH, P.J., and BATES, C.J., concur.