**In re the ESTATE OF: Wilbur Jack POSEY, Incapacitated and Disabled, Appellant,**

v.

**Julia Posey BERGIN, Respondent.**

**No. ED 91483.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 3, 2009.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 17, 2009.

since retired from the court.

Matthew J. Rossiter, Lisa M. Montano, Rossiter & Boock, LLC, St. Louis, MO, for Appellant.

Dennis G. Schafer, Montgomery City, MO, for Respondent.

KURT S. ODENWALD, Presiding Judge.

## Introduction

This matter relates to the potential conflict between the personal rights of individuals placed under the supervision of a guardian and the broad powers granted to the guardian to care for persons placed under their supervision. In particular, we consider whether the trial court erroneously interpreted or applied the law when it denied Appellant's Motion to Compel Visitation and Communication Privileges, and whether there was sufficient evidence to support the trial court's finding of incapacity and denial of Appellant's Petition to Terminate the Guardianship and Conservatorship and Motion to Remove Guardian. We affirm the trial court's rulings.

## Background

On April 22, 2003, the appellant, Wilbur Jack Posey (Father), was found by the Probate Division of the Circuit Court of Montgomery County to be incapacitated and disabled. Since April 2003, Father has been under the supervision of a guardian and conservator. Father's daughter, Julia Posey Bergin (Daughter), has served as Father's conservator since April 2003 and his successor guardian since September 2, 2003. The guardianship and conservatorship were ordered in 2003 as a result of the effects of Father's alcohol dependence and abuse on his physical and mental condition. On August 27, 2004, Father filed a petition to restore capacity and ability, and to terminate the guardianship and conservatorship. A trial was conducted on August 31, 2005, following which Father's motion to terminate guardianship and conservatorship was denied. Father appealed the denial of his motion to this Court, which filed its mandate on October 20, 2006, affirming the trial court's judgment. *In re Posey*, 202 S.W.3d 46 (Mo. App. E.D.2006).

On June 28, 2007, Father filed a Motion to Compel Visitation and Communication Privileges and/or for Removal of Guardian (Motion). Father subsequently filed a Petition to Restore Ward/Protectee and to Terminate Guardianship/Conservatorship (Petition) on December 26, 2007. Father's Motion challenges the restrictions placed on Father's visits, phone calls, and mail privileges by Daughter in her capacity as guardian. In his Petition, Father claims he is no longer incapacitated under Missouri law and, therefore, his guardianship and conservatorship are no longer necessary and should be terminated. More specifically, Father claims that as a result of

his sobriety over the past several years, he has recovered from the cognitive and mental impairment first caused by his alcohol abuse, and the condition upon which his guardianship was first imposed no longer exists. A trial was conducted on May 14, 2008, at which time evidence was adduced by Father as well as Daughter.

### 1. Evidence Presented to the Trial Court

Both Father and Daughter presented evidence at trial on the various issues raised under Father's separate Motion and Petition. Evidence was presented through numerous witnesses, deposition testimony, and exhibits. Evidence relevant to Father's Motion focused primarily on the need for the various restrictions imposed on Father by Daughter during his residence at Parc Provence Care Center (Parc Provence), a residential facility providing care for persons suffering from various degrees of dementia and Alzheimer's, and whether the restrictions deprived Father of being placed in the least restrictive environment. The evidence relating to Father's Petition focused on Father's alcohol dependency and abuse and the resulting medical conditions upon which the initial finding of Father's incapacity was premised, his medical condition and cognitive state since the initial finding of incapacity, his interaction with the staff at Parc Provence, and his ability to evaluate the information necessary for him to provide for his own care. Of particular emphasis was evidence concerning Father's ability to evaluate information that would allow Father to manage his alcohol dependency and resulting medical conditions, as well as his own medical care. During the trial, the following evidence was presented.

### A. Daughter's Testimony

Daughter testified that Father lives at Parc Provence. Prior to living at Parc Provence, Father resided at the New Florence Nursing Care Center. While Father has lived at Parc Provence, Daughter has placed various restrictions on his mailing privileges. Daughter required that any mail sent to Father from his sister Florence McGuire (Sister) or past "drinking buddy" Jim McDaniel (McDaniel) first go through her. Daughter sometimes reviewed mail sent by Father, too, depending on Father's condition at the time. Daughter usually reviewed Father's mail when he was going through a violent phase, because she wanted "to know what was going on."

Daughter also restricted Father's telephone privileges while at Parc Provence. Daughter compiled a list of persons from whom Father could receive phone calls and to whom Father was permitted to make phone calls. Persons who placed phone calls to Father, but were not on the list, were required to contact Daughter first before Father was allowed to call them back.

Daughter also placed restrictions on the visitors Father could receive while residing at Parc Provence. The restrictions on visits, mail and phone calls were directed at two individuals, Sister and McDaniel. Daughter testified that she imposed the restrictions regarding Sister and McDaniel because Daughter perceived a cause and effect pattern whenever Father had unmonitored contact with them. According to Daughter's testimony, after Father had contact with Sister or McDaniel, "Dad began to have dissatisfaction with his living at New Florence Nursing Care Center, and began to petition me to go home, and began to leave more and more angry messages on my home phone. That he wanted to go home. That he would go home." Daughter testified that Father would be angry with her after a visit with McDaniel. Daughter testified about a specific incident in 2002. Daughter also testified to an

incident in 2003, prior to the time she imposed visitation or communication restrictions, when McDaniel used bad judgment and pressured Father to go to a football game in heavy rain at a time there were medical concerns about Father's heart. Daughter described another time when McDaniel visited Father and brought beer.

With regard to Sister, Daughter testified that Sister wrote letters to Father every week, which often commented negatively upon Father's living situation in a nursing home. Daughter testified that Father often became "increasingly negative about the nursing home" after receiving letters from Sister.

Daughter explained that when the visitation and communication restrictions are in place, "Dad does well. He's mellow, he's acclimated to his surroundings. Whenever [Father and McDaniel have] gone around them and found a courier for themselves, Dad has altercations."

Daughter testified that after the trial court denied Father's first petition to terminate the guardianship in 2005, she decided to maintain the restrictions about which Father had complained. Daughter acknowledged the findings of fact contained in the trial court's 2005 order, which stated that permitting uncensored contact with McDaniel and Sister might improve Father's perception of his living arrangements. Daughter explained that she did not alter the visitation and communication restrictions because she considered the trial court's findings to be "a suggestion, not a mandate." Daughter testified that she was fully aware of Father's history with McDaniel and Sister, and that she felt there was a recurring pattern that was "problematic." Daughter further explained that she chose to continue the visitation, mail and phone restrictions because she saw Father fail in his

recovery from alcohol abuse as he attempted to obtain alcohol despite the restrictions and six months of Alcoholics Anonymous (AA) meetings. Daughter said she did not regret her decision to continue the restrictions because Father's pancreatitis reoccurred that year even without ·alcohol consumption. Daughter expressed her concern over the serious medical consequences to Father had he been able to consume alcohol during that time.

Daughter testified that following the first trial in 2005 and the 2006 appeal of that judgment to this Court, Father was involved in other incidents involving aggressive behavior at Parc Provence, specifically during June 2006. Because of those incidents, Daughter was told by Parc Provence employees that Father would either be placed on around-the-clock private duty or be expelled from Parc Provence if he had another physical altercation. This ultimatum was confirmed in a letter to Daughter from Marcia Azar (Azar), the administrator of Parc Provence.

Daughter testified that Father's improved mental and physical condition resulted from the care and enforced sobriety that he had received at Parc Provence. She doubted that Father would be in his present condition had the sobriety not been enforced. Despite his improved condition, Daughter testified the she still notices Father's memory problems, such as when he requested a flag pole for Parc Provence around Christmas 2007, after one previously had been installed already that fall. Daughter testified that sometimes Father repeats the same stories to her, and other times during conversation, Father often "just doesn't seem to understand" what she or her husband are saying, even after they repeat or rephrase their thoughts. On outings away from

Parc Provence, Daughter said that Father seems to become disoriented at times.

With regard to Father's medical conditions other than his alcohol dependency and abuse, Daughter testified that Father suffered from pancreatitis, arteriosclerosis, high blood pressure, and hypothyroidism. She also testified that Father told the dermatologist that he had a skin lesion on his back for about a year, but never told anyone about it. Father denied skin checks despite his history of skin cancers. Daughter gave examples of Father inaccurately reporting his spiking blood pressure and shortness of breath to his cardiologist.

When asked about Father's Motion to remove her as guardian, Daughter testified that she did not think her removal as guardian would improve their relationship. She explained:

> ... I care about my father. We see that he has a lot of activities and interests that he really truly enjoys. And I feel obligated to my parent. I want what's best for him. I think I understand him, probably better than a lot of people would.... The biggest problem in his life is alcoholism. And he says that he understands that, but I don't think he is a recovering alcoholic at the moment. He's not engaged in activities that would help that actively.
>
> And I've noticed changes in him since his addiction took over his life that concern me.

Although Daughter believed that Father still needed a guardian and did not think Father had the ability to make decisions regarding his healthcare or finances, she testified that she could try to ease the restrictions on contact with Sister, "and start there and see how it goes."

B. *Father's Testimony*

Father acknowledged during his testimony that he was an alcoholic, and that he understood alcoholism is never cured. Father testified that he would not drink alcohol if his restrictions were removed because he did not want to die. Father stated that he understood the medical consequences if he resumed drinking alcohol and specifically that alcohol would interfere with his medications. Father acknowledged that he had not attended AA meetings recently, but testified that "the abstinence from alcohol for a period now of I think three and a half years, has reinforced my—my feeling that I don't need [alcohol]." Father explained that if he lived on his own, he would be living on a "pretty tight budget, and there won't be any place in [his life] for alcohol" because alcohol is more expensive than gasoline. When Father was questioned about having more money at his disposal if he were to move into a less expensive facility than Parc Provence, Father answered that he had no knowledge about his money or assets because his daughter had kept it from him for the past few years.

With regard to his medical condition, Father testified that he suffers from congestive heart disease, high cholesterol, glaucoma and cataracts, and had a gallbladder removal and two hernia repairs. Father disagreed with his doctor that he had suffered from frontal lobe brain damage or brain injury, as well as from alcoholic dementia. Father testified that his heart was "doing pretty well."

Father expressed his frustration in that he read the newspaper on a daily basis, but he could not converse with other residents at Parc Provence about politics. Should Father's guardianship be terminated, Father testified that he hoped to look into an assisted living facility in St. Louis County with fewer restrictions and with other people who are not mentally incapacitated. Although Father testified that he wanted a "more vigorous lifestyle," he ad-

mitted that his placement at Parc Provence has been helpful to him in that he learned to sing again and it has kept him away from alcohol. Father testified that he believes he would be dead if he had access to alcohol during the years he resided at Parc Provence. Father could not remember whether he was living at Parc Provence at the time of his last trial in August 2005.

Father testified that although he was restricted from telephoning or seeing Sister or McDaniel, he would like to be able to see them. He requested that the trial court remove the guardianship and restore his capacity, or in the alternative, appoint a new guardian. Regarding a new guardian, Father stated, "I think it would improve the relationship with my daughter. Because then, if I did something that was improper and was corrected by my guardian, then I wouldn't blame my daughter for it."

### C. Nurse Posley's Testimony

Cherie Posley (Nurse), a licensed practical nurse at Parc Provence, testified that she conversed with Father on a daily basis and that he understood her well. Nurse testified that Father would shower, get dressed and come to breakfast on his own every morning, and that she would simply deliver his medications to him and watch him take them. Nurse said she could not speculate whether Father could go to the store and buy his medications, but she thought he could take his own medications if he had some assistance in making the medications available and writing down the dosages and times. She said that Father knew the names of some of his medications and told her that he had been studying them. However, Nurse also testified that sometimes Father asked her questions about his medications, and then repeated the same questions about the same medications days later.

Nurse testified that Father assisted staff with other residents by pushing the residents in their wheelchairs. Nurse described Father as different from the other residents at Parc Provence because he did not need assistance or reminders for many things; he was cognitive and intelligent, and "alert and orientated times three." Nurse explained that because Parc Provence is a dementia facility, Father does not seem to fit in with other residents. Nurse testified that when Sister visited Father daily for a week during August 2007, Father seemed happy and was in a good mood. Nurse testified that Father is restricted from drinking alcohol at the Parc Provence happy hours because of his alcohol dementia diagnosis. She was not aware of any time when Father attempted to obtain alcohol while at Parc Provence.

### D. Sister's Testimony

Sister lives in Denver, Colorado and last visited Father in August 2007. She testified that she was aware of Father's problem with alcohol since his wife died in 1998. She noted that Father has not consumed alcohol since he lived at Parc Provence due to his restrictions. Sister testified that Father knows that he has a problem with alcohol, and the people and activity that surround him help Father ward off the urge to use alcohol. Sister has never spoken with Father on the telephone since he has lived at Parc Provence, although she has attempted to call him. She writes letters to Father twice per month and receives letters back from him. Sister expressed her concern over the delay between the time Father writes letters to her and the time she receives the letters. Sister testified that some of the letters she has received appeared as though they were resealed. Sister knew that Father used couriers to place letters in the mail to her.

### E. Son–in–Law's Testimony

Dennis Bergin (Son–in–Law), Daughter's husband, also testified at trial. A substantial portion of Son–in–Law's testimony focused on Father's alcohol abuse. Son–in–Law testified that he took Father to AA meetings once a week for about seven months. Son–in–Law explained that Father would participate in reading from the twelve-step book that was passed around at the meetings, but "really didn't" participate in the discussion portion of the meeting when people shared thoughts with the group. Son–in–Law recounted times when Father characterized the upcoming AA meetings as going to "visit the losers." Otherwise Father did not discuss the AA meetings. Son–in–Law explained that Father has not attended any AA meetings since the middle of 2005.

Son–in–Law testified that during the course of conversation with Father in July 2007, Father commented that a drink or two a day are good for a person. When Son–in–Law replied that was not the case for an alcoholic, Father yelled and replied, "Well, I can. Studies have shown that a drink or two a day are good for a person." Father explained this statement when he testified in court that he had read that a glass of red wine once a day is healthful for some people, but that he recognized having a glass of wine would not be good for him because he was an alcoholic.

### F. *Fr. Doyle's Testimony*

A priest, Fr. Edward Doyle (Fr. Doyle), testified that he had known Father since about 2000 and had visited with him at Parc Provence on a few occasions. Fr. Doyle testified that other than the fact that Father is an alcoholic, he did not believe Father would try to start drinking again. Fr. Doyle acknowledged in his testimony that he had no training in the evaluation or treatment of alcoholics or people suffering from alcohol dependence.

### G. *Dr. Krueger's Testimony*

Gregory Krueger (Krueger) testified that he is trained in alcohol dependence and offered general testimony about persons diagnosed with alcohol dependence. Krueger testified regarding various factors needed for a person diagnosed with alcohol dependence to successfully refrain from drinking. In particular, Krueger testified about the need for education about the disease process of alcohol dependence, as opposed to the moral issues. Krueger explained that persons with alcohol dependence need to be educated about their need to remain alcohol free, as though staying away from an allergen. They also need a very strong non-alcohol support system, which sometimes, but not always, involves attending a twelve-step recovery program and identifying a person who can act as a sponsor.

Krueger testified that an important part of an alcoholic's success stems from staying away from people with whom someone had used before. According to Krueger, associating with such people

> starts to erode that recovering person's resolve to stay alcohol free. If an old drinking companion comes back into that person's life and starts to subtly sabotage the recovery program by saying things like, 'Oh, one drink won't hurt you,' or 'No one will know. It will just be our secret,' or things along those lines . . . .

Krueger was questioned about the recovery for alcohol dependent persons who had been had been confined or involuntarily kept off of alcohol. With regard to this situation, Krueger testified that

> [i]t is accepted that the person is always vulnerable to the substance of alcohol. Whether they have been forcibly, you know, on a desert land, you know, prohibited from coming into contact with it. You put them back into an alcohol—a

culture where alcohol is available, they have just as much the vulnerability that they had when they stopped, or when they were forced to stop.

With regard to persons who have had a period of enforced sobriety placed upon them, Krueger testified that typically the fact that such person acknowledges that he should not drink is not enough to successfully stay off of alcohol. Krueger testified that such individual needs motivation, a social support system, a person guiding him to an alcohol free lifestyle, and education about the need to stay away from alcohol.

### H. *Deposition Testimony*

Deposition testimony from March 2008 from Azar, Dr. David Carr (Dr. Carr), and Dr. Ellen Binder (Dr. Binder) was also admitted to the trial court for its review.

### 1. *Marcia Azar*

Azar, the administrator of Parc Provence, testified that she sees Father several times a week when she tours through the building. She has no difficulty communicating with Father. Father is the highest-functioning resident at Parc Provence. Azar testified about one incident that gave Parc Provence personnel concern. In June 2006, Father hit a resident who was found in Father's bathroom. Azar also testified about an incident in May 2007, when a resident sat in Father's seat and Father raised his fist to her. The other resident moved out of the seat. Azar did not express concern about this incident. Azar testified that Parc Provence notified Daughter that if an incident reoccurred, Father would go on private duty or be asked to leave the facility. Azar testified that currently, Father is not in imminent danger of being expelled from Parc Provence or being placed on private duty.

Azar further testified that in May 2007, McDaniel met Father at a Parc Provence outing at Outback Steakhouse, where the two ate lunch together. The two did not drink alcohol. Azar also testified that McDaniel came to Parc Provence for a car show in September 2007 and was asked to leave. McDaniel stated that he would not leave without the police, who were then called and asked McDaniel to leave the premises. Azar testified that she had no reason to believe Father was agitated or inappropriate after those occasions when Father saw McDaniel. Azar testified that at this point, she did not think it was necessary for Father's mail to be reviewed, nor did she think it was necessary for his phone conversations and contacts or visitors to be restricted. She did not, however, know how Father would function in a new setting without structure, restrictions, or caregivers.

### 2. *Dr. Carr*

Dr. Carr is the medical director at Parc Provence, and testified that he was Father's primary physician from August 2004 until April 2006. Dr. Carr testified that his diagnosis of Father in August 2005 included alcohol dependence. After reviewing his records from treating Father, Dr. Binder's deposition, and a two-page report from Daughter regarding observations and interactions she and family members had with Father, Dr. Carr testified,

I'm confident, based on the information I've reviewed, that within a reasonable degree of medical certainty he would go back drinking. Now, if he went back drinking small amounts that didn't harm him, it's possible he could continue to do well in his environment, but that hasn't been his pattern, and I think that if he went back and followed his pattern before, I think almost assuredly cognitive impairment would follow and we'd be back to square one.

Dr. Carr also testified that he believed Father's restrictions on telephone calls, visitors, mail, and trips away from Parc Provence were too restrictive. However, Dr. Carr also testified that if some of Father's restrictions limited his contact with people who have not been supportive of his placement or treatment in the past, the restrictions were more reasonable. Dr. Carr acknowledged in his testimony that he would have some concerns about a visitor who was a former drinking buddy, if that person was actively drinking. Dr. Carr believed there was a high risk of that person offering Father alcohol when Father was with him. Dr. Carr testified that a skilled nursing facility like Parc Provence, with around-the-clock skilled nurses who can recognize alcohol usage and bring the information back to the physician, would probably discover if Father was drinking again sooner than an assisted living setting.

### 3. *Dr. Binder*

Dr. Binder testified that she is Father's treating physician at Parc Provence and has been for a couple of years. Dr. Binder testified that she was aware of Dr. Carr's 2005 diagnosis of Father for cognitive impairment specifically related to the frontal lobes, and that Father's cognitive impairment had improved with good care. Dr. Binder testified that during February 2008, Father had performed "perfectly" on the Mini Mental State Examination, which is a cognitive test administered and used to identify patients with significant cognitive impairment or dementia. On a different psychometric test developed to assess with greater specificity the presence of dementia, Dr. Binder testified that Father scored "well within the normal range, indicating that he did not score like someone who has dementia would score." Dr. Binder disagreed with Father's previous diagnosis of alcoholic dementia because demen-

tia is a progressive cognitive decline, and Father did not follow a pattern of decline. Dr. Binder testified that based on her testing of Father, she believed that Father's current living arrangement was too restrictive. However, Dr. Binder said it was difficult to make a judgment about whether Father could receive information and make decisions to meet his essential requirements such as food, clothing, shelter, safety, and health care because Father "appears to be using good judgment in the situation he's in, so, ... My sense is that he needs some oversight." Dr. Binder also did not know whether Father needed a guardian because "[i]t's very hard to know what someone's going to do in a less restrictive situation."

Dr. Binder testified that although Father expressed to her that he should not drink and would not drink, she did not know whether Father would use alcohol if he were free to do so. Dr. Binder testified that she was very worried "about [Father] being left entirely to his own devices."

### I. *Parc Provence Records*

Records from Parc Provence were read to the trial court and admitted into evidence. The records stated that Father hit another resident who had wandered into his room on June 18, 2008. Father admitted that he found another resident in his room and hit him. Previous to that incident, Father had raised his fist to another resident who sat in Father's seat at dinnertime and was not willing to get up. On June 14, 2007, the records stated that Father was "[a]lert and orientated times three. Occasionally slightly forgetful, with aggressive behaviors at times."

### 2. *Trial Court's Judgment*

#### A. *Motion to Compel Visitation and Communication Privileges*

The trial court entered its Judgment, Findings of Fact and Conclusions of Law on June 10, 2008, denying both Father's Motion and Petition. The trial court denied Father's Motion to Compel Visitation and Communication Privileges finding that there exists "no authority in the Probate Code to grant [Father's Motion]." In denying the Motion, the trial court reviewed its statutory authority and stated that once a guardian is appointed, the court does not become a "co-guardian with veto power over the appointed guardian." Rather, the court explained that its jurisdiction "is limited to making findings as set out in Sections 475.110 and 473.140, RSMo. [2000 [1]], for the removal of guardians upon an allegation that the guardian is not properly performing her guardianship responsibilities under Section 475.120."

B. *Petition to Terminate Guardianship*

With regard to Father's Petition, the trial court found that Father is not able to receive and evaluate information or to communicate decisions in order to meet essential requirements for food, clothing, shelter, safety or other care such that serious physical injury, illness or disease is not likely to occur. The court reasoned that testimony from Dr. Binder and Dr. Carr failed to show that Father no longer needs a guardian and conservator. The trial court also noted that Father's own testimony did not support his argument when he could not recall where he lived during his last trial and what year his son died; incorrectly testified regarding the last time he had attended an AA meeting, and expressed no remorse for assaulting other residents at his care facilities.

The trial court further found that Father has not taken steps to deal with his alcohol dependence. Father last attended an AA meeting in April 2005, did not know the consequences of using alcohol while he was on his medications, and expressed that a reason he would not drink again was because of a tight budget. To his Son–in–Law, Father stated that a drink or two a day is good for a person, and when challenged by Son–in–Law that he could not drink any alcohol, Father stated, "Well, I can." Father referred to the AA meetings as going to "meet with the losers." Father did not actively participate in the meetings or express any insight gained from them, nor did he express a desire to attend another AA meeting after April 2005. The trial court noted the testimony of Krueger, a substance abuse treatment expert, regarding the necessary steps a person with alcohol dependence must take to stay alcohol-free, and found that Father does not appreciate the seriousness of his dependence and the consequences of using alcohol in the future.

The trial court also noted in its findings that Father was not able to manage his health care on his own, especially in light of his disagreement with the doctor regarding one diagnosis, and his exclusion of medical problems when explaining them to the court. Father failed to recall what occurred at an eye doctor appointment upon his return home in August 2007, he failed to give his cardiologist significant information regarding his health in 2007 and March 2008, and he failed to seek any medical care for skin lesions he had known about for a year. Additionally, in Father's current living environment, he does not have to schedule doctor's appointments, understand his medications, fill his own prescriptions, or measure dosages. No testimony was presented at trial that Father demonstrated an ability to do those things if needed. Daughter testified that Father's health and memory seems to be

1. All subsequent statutory citations are to RSMo 2000, unless otherwise indicated.

declining, and that he sometimes becomes disoriented on outings away from his facility at Parc Provence.

The trial court found, "as a whole, the evidence does not establish by a preponderance of the evidence that the guardianship and conservatorship should be terminated and that [Father] has the capacity to meet his essential requirements without court-ordered assistance."

Additionally, the trial court found that Father was unable to receive and evaluate information or to communicate decisions to such an extent that he has the ability to manage his financial resources based on his statement about being on a tight budget without the guardianship/conservatorship, and that Father's living environment was indeed the "least restrictive environment" according to Section 475.010(10) given the unknown nature of supervision Father might receive at a different facility.[2]

Regarding Father's request that the trial court make findings as to the necessity of censoring Father's sending and receipt of mail, restricting his access to the telephone, restricting the persons with whom Father is allowed to visit, restricting uncensored contact with visitors of his choosing, and prohibiting his ability to spend the day away from Parc Provence with persons of his choosing, the trial court found that the restrictions on contacts with McDaniel are "absolutely essential" to maintain Father's health and abstinence from alcohol; additionally, the trial court noted that "[w]hile the Court feels that the restrictions as to [Sister] could be relaxed at this point, it is not the Court's place to second-guess the Guardian on these day-to-day matters."

In responding to Father's request that the court make a finding regarding Fa-

ther's right to vote, the trial court found that Section 115.133 mandates, "No person who is adjudged incapacitated shall be entitled to register to vote," and thus, Father should not be allowed to vote.

### C. *Motion to Remove Guardian*

Finally, the trial court denied Father's Motion to Remove Guardian and ruled that Daughter should not be removed as guardian and conservator or her letters revoked, based on Sections 475.082, 475.110, and 475.120. The trial court found that Daughter is discharging her duties and responsibilities as required by the probate code, and is acting in the best interests of the ward or protectee. The trial court found that Father should not be allowed to nominate a successor guardian and conservator, subject to the court's approval, and further found that Father had not nominated anyone to serve as a successor guardian or conservator at trial. Lastly, the trial court found that Father should not be allowed to choose a different assisted living facility in which to reside because Section 475.120 vests such duty with the guardian.

The trial court's Conclusions of Law stated:

[Father] has not proven by a preponderance of the evidence that he has been restored to his capacity or ability. [Daughter] is discharging her duties and responsibilities as guardian and conservator as required by law and is acting in the best interests of [Father]. [Father's] current living environment and the restrictions currently in place regarding visitors, mail and telephone contact is the least restrictive environment necessary to prevent [Father] from injuring himself and others and to provide him with such care, habilitation and

---

2. The record does not reflect any allegations or evidence that Daughter mismanaged or misused Father's financial resources, or in any way failed in her duties as conservator.

treatment as are appropriate for him considering his physical and mental condition and financial means. (citations omitted).

Father filed his Notice of Appeal with this Court on June 20, 2008. This appeal follows.

## Points on Appeal

Father raises four points on appeal. In his first point, Father alleges the trial court erred in denying his Motion because the court erroneously interpreted Missouri law to prohibit it from considering Father's Motion to Compel Visitation and Communication Privileges. Father argues that Section 475.082 creates an ongoing duty for the court to supervise the relationship between a ward and a guardian, and gives the court the authority to order specific action by the guardian. Father argues the trial court's error was not harmless because the evidence at trial showed that Daughter has not placed Father in the least restrictive environment.

In his second point, Father argues that the trial court erred in denying his Petition because the court's decision is against the weight of the evidence in that Father proved by a preponderance of the evidence that he is no longer incapacitated and is capable of receiving and evaluating information and communicating decisions to the extent necessary to meet his essential requirements for food, clothing, shelter, and safety.

In his third point, Father contends that the trial court erred in denying his Motion for Removal of Guardian because the court's decision is against the weight of the evidence. Father argues that there was substantial evidence presented at trial that Daughter refuses to consider Father's improved condition, and refuses to consider removing or modifying the restrictions she placed on Father in 2004. Father argues

that such evidence supports his claim that Daughter is not acting in the best interests of Father, and requires her removal as guardian.

Finally, in his fourth and last point, Father alleges that the trial court erroneously declared and applied the law in finding that he is not allowed to vote because the court has authority pursuant to Section 475.078 to order that a person adjudged incapacitated shall retain the right to vote.

## Standard of Review

■ The review of a trial court's judgment in a non-jury probate proceeding involving the termination of guardianship is governed by the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *In re Estate of Haan*, 237 S.W.3d 231, 233 (Mo.App. S.D.2007). Thus, the judgment will be affirmed by the appellate court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously applies the law. *Id.* "Substantial evidence is competent evidence from which the trier of fact could reasonably decide the case." *Estate of Schooler*, 204 S.W.3d 338, 344 (Mo.App. W.D.2006). An appellate court defers to the probate court in its role as the finder of fact, giving "due regard to the opportunity of the trial court to have judged the credibility of witnesses." *Id.;* Rule 84.13(d)(2).

## Discussion

### I. Point I—Motion to Compel Visitation and Communication Privileges

■ In his first point on appeal, Father alleges the trial court erroneously interprets Missouri law to prohibit it from considering a Motion to Compel Visitation and Communication Privileges. Such finding, Father argues, is contrary to the court's ongoing duty to supervise the relationship

between a ward and a guardian that is created under Section 475.082. Father argues that the duty imposed on the court under Section 475.082 gives the court the authority to order specific action by the guardian. Specifically, Father takes exception to the portion of the trial court's judgment that states:

> The Court is not a co-guardian with veto power over the appointed guardian. The Court's jurisdiction, once a guardian is appointed, is limited to making findings as set out in Sections 475.110 and 473.140, RSMo., for the removal of guardians upon an allegation that the guardian is not properly performing her guardianship responsibilities under Section 475.120.

Father suggests that Section 475.082 requires the probate court to maintain an ongoing supervision of the relationship between the guardian and ward, and to modify the guardian's authority when necessary. The probate court is obligated under Section 475.082 to inquire into the status of every ward to ensure the guardian is discharging his or her responsibilities and duties as required by law. Section 475.082.1. Father argues that this authority allows the court to overrule and countermand a guardian's actions. Father contends that because the trial court found that the restrictions imposed by Daughter regarding Sister were "unnecessary," the court erroneously concluded that it lacked authority to grant Father's Motion and remove the restrictions. Instead, Father argues, the trial court should have removed the restrictions un-

der the authority granted by Section 475.082 because such restrictions precluded Father from living in the least restrictive environment.

We understand Father's concerns regarding the breadth of the restrictions currently in place and his desire to be released from the constraints on his freedom to live as he chooses. We are further mindful of the benefits of avoiding a strict paternalistic approach when possible, and embracing a solution that is respectful of Father's personal desires. Nevertheless, we disagree with Father's contention that the trial court erroneously interpreted or applied Section 475.082. To the contrary, we find that the trial court acted in accord with Section 475.082 when it declined to "second-guess" or otherwise interject itself into the day-to-day decisions of the guardian, and properly limited its review to whether the guardian discharged her duties in accordance with the law, acting in the best interests of the Father.[3]

Section 475.082 requires the court to annually inquire into the status of a ward for the purpose of "determining whether the incapacity or disability may have ceased and to insure that the guardian or conservator is discharging his responsibilities and duties in accordance with this chapter." Section 475.082.1. Further, the statute describes that in the event that a hearing take place regarding whether the guardian or conservator is discharging his responsibilities and duties as required by this chapter or whether he or she is acting in the best interests of his ward or protectee,

---

**3.** Although the trial court stated in its Judgment that it has no authority under the Probate Code to grant Father's Motion to Compel Visitation and Communication Privileges, and was limited to making findings related to the removal of guardians under Section 457.110 and 473.140, the trial court in fact reviewed and considered Father's allegations relating to the restrictions on Father's visitations, phone privileges and mailing privileges, and permitted evidence relating to such claims as it considered Father's Motion for Removal of Guardian. The trial court made conclusions of law that the guardian discharged her duties as required by law and acted in the best interests of the ward under Section 475.082.

[a]t the conclusion of the hearing, if the court finds that the guardian or conservator is not discharging his duties and responsibilities as required by this code, or is not acting in the best interests of the ward or protectee, the court shall enter such orders as it deems appropriate under the circumstances.

Section 475.082.5. The court's orders may include the removal of the guardian or conservator and the appointment of a successor, or termination of the guardian or conservatorship "on finding that the ward has recovered his capacity or the protectee is no longer disabled." Section 475.082.5. This section also states that the court "shall give due consideration to the exercise by the guardian or conservator of any discretion vested in him by law." Section 475.082.5.

Although we agree with Father that the probate division court is given a duty to supervise a relationship between a guardian and ward, and must be actively aware of its obligations, the intensity and level of supervision suggested by Father in his Motion to Compel Visitation and Communication Privileges extends beyond the scope of supervision provided under Section 475.082. We disagree with Father that the trial court's proper exercise of such duty would alter the trial court's decision. To the contrary, in accord with its duty to supervise, the trial court gave "due consideration" to the guardian's exercise of discretion, as is required under Section 475.082.5.

The trial court's unwillingness to second-guess the decisions of the guardian with regard to matters such as visitation and communication privileges is wholly consistent with the statutory admonition that the trial court give due consideration to the guardian's discretion and avoid acting as a "co-guardian." By avoiding a review of day-to-day decisions made by Daughter, and focusing on the core issue of Father's best interests, the trial court demonstrated its understanding of the line over which it should not cross. Because we find no error in the trial court's interpretation or application of Section 475.082, we need not address the remaining portion of Father's first point.[4] Point I is denied.

## II. Points II and III—Substantial Evidence Supports Continuation of the Guardianship and Continuation of Daughter as Guardian

For clarity, we will address Father's second and third points on appeal together. Each of these two points is premised upon Father's claims that the trial court's judgment lacks the requisite evidentiary support. The overlap of evidence and argument relating to Father's claims regarding the propriety of the guardianship and the court-appointed guardian warrants our combined treatment of these two points. Point II alleges as error the trial court's ruling that continues the guardianship and conservatorship. Point III challenges the trial court's refusal to remove Daughter as guardian.

### A. Father's Incapacity

In Point II, Father argues that the trial court erred in denying his Petition because the court's decision is against the weight of the evidence in that Father proved that he is no longer incapacitated and is capable of receiving and evaluating information and communicating decisions to the extent necessary to meet his essen-

---

4. Although we do not address Father's claim that Daughter has not placed him in the least restrictive environment as part of our analysis of his first point on appeal, we review the evidentiary basis for Father's claims relating to his living environment in our analysis of Point III, as such evidence is relevant to Father's Motion for Removal of Guardian.

tial requirements for food, clothing, shelter, and safety.

Section 475.083.1(2) allows for termination of a guardianship when an incapacitated person has been restored to his capacity or ability. Father argues that under Section 475.083.6, he has established by a preponderance of the evidence his capacity to meet his essential requirements for food, clothing, shelter, safety, and other care has been restored, and therefore the trial court erred in not restoring his capacity. *See also, In re Estate of Werner*, 133 S.W.3d 108, 110 (Mo.App. W.D.2004). Although the evidence strongly suggests Father, as a result of his enforced sobriety, has regained significant cognitive ability that was impaired by his alcohol abuse, we disagree that Father has established the necessary prerequisites that he has been restored to his capacity or ability under Section 475.083.

■ In determining the sufficiency of the evidence presented to the trial court, an appellate court shall accept as true the evidence and inferences from the evidence that are favorable to the trial court's judgment and disregard all contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989).

With regard to Father's capacity and ability, the evidence presented to the trial court demonstrates that Father could wake up in the morning, shower and dress for breakfast on his own. Father did not prepare his own meals. Father did not dispense his own medications, and several witnesses testified that they did not know whether Father was capable of doing so. Although there was some testimony that Father could take his medications on his own if someone else prepared them for him, conflicting evidence was presented that Father asked questions regarding his

medications and sometimes repeated the same questions later.

A significant portion of the evidence relating to Father's capacity revolved around Father's dependency and use of alcohol, and his medical conditions related thereto. Significant questions were raised regarding Father's potential relapse without the enforced sobriety. Dr. Binder testified that it was difficult to know how Father would respond to a less restrictive environment, specifically whether he would use alcohol again if he were free to do so. Dr. Can-testified that the tests administered to Father did not assess judgment questions. Dr. Carr opined that Father is unable to receive and evaluate information regarding the use of alcohol to the extent that Father lacks capacity to meet his essential requirements for food, clothing, shelter, safety or other care. Dr. Carr testified that he believed Father would likely drink again if given the opportunity.

Substantial evidence was also presented at trial regarding Father's ability to address his medical needs that were not related to his alcohol dependency. Evidence was presented that Father sometimes became confused during conversations. Father forgot or failed to provide his doctor with important medical information. Father disagreed with his doctor's diagnosis of frontal lobe brain injury due to alcohol use. Even while testifying at trial, Father failed to disclose some of his medical conditions and was confused as to significant life events such as when his son died, when he last attended AA meetings, or where he lived during his last trial.

Despite evidence that Father has regained significant cognitive ability during his residency at Parc Provence, when viewing the evidence in the light most favorable to the trial court's judgment, we cannot conclude that the trial court erred in finding that Father had not proven by a

preponderance of the evidence that Father had been restored to his capacity or ability.

B. *Removal of Daughter as Guardian*

■ In Father's third point, he claims the trial court erred in denying his Motion that Daughter should be removed as guardian. This point is premised upon Father's contention that the restrictions placed upon Father's visitation and communication privileges are unduly restrictive and do not serve his best interest as required by law. Because Father's entire basis for seeking removal of Daughter as guardian stems from the visitation and communication restrictions, we analyze these restrictions under the requirement that Daughter provide for Father's care in "the best and least restrictive setting reasonably available."

As in his first point on appeal, Father claims the evidence showed that Daughter has not placed him in the least restrictive environment. We find substantial evidence supports the trial court's finding that Father's living environment is the least restrictive environment as required under Missouri law. Sections 475.110 and 473.140 provide for the removal of a guardian, conservator, or personal representative for failing to discharge his or her "official duties." Section 473.140; Section 475.140. The general powers and duties of a guardian of an incapacitated person are enumerated in Section 475.120, which requires the guardian to "act in the best interest of the ward." Section 475.120.2. The guardian shall "take charge of the person of the ward and [ ] provide for the ward's care, treatment, habilitation, education, support and maintenance"; the guardian's powers and duties include, but are not limited to, the following:

(1) Assure that the ward resides in the best and least restrictive setting reasonably available;

(2) Assure that the ward receives medical care and other services that are needed;

(3) Promote and protect the care, comfort, safety, health, and welfare of the ward;

(4) Provide required consents on behalf of the ward;

(5) To exercise all powers and discharge all duties necessary or proper to implement the provisions of this section.

Section 475.120.3.

"Least restrictive environment," as used in Section 475.120.3(1), is defined by Section 475.010. According to this section, "there shall be imposed on the personal liberty of the ward only such restraint as is necessary to prevent him from injuring himself and others and to provide him with such care, habilitation and treatment as are appropriate for him considering his physical and mental condition and financial means." Section 475.010(10). Such environment "must be no more restrictive of civil rights than is necessary for the adequate protection of an individual." *In re Weissinger,* 720 S.W.2d 430, 434 (Mo.App. E.D.1986).[5]

5. Father first raises the issue of "least restrictive environment" in connection with his claim of error that the trial court failed to consider Father's Motion as required under Section 475.082. Although the trial court's findings on this issue were included as part of its review of the guardianship under Section 475.110 and Section 475.120, the trial court's findings are equally applicable to its findings that Daughter is discharging her duties and responsibilities as guardian and conservator as required by law and is acting in the best interests of Father under Section 475.082. The factual underpinnings of the court's findings are the same whether the issue is analyzed under Section 475.110, Section 475.120 or Section 475.082.

A finding of whether Father is placed in the "least restrictive environment" was at the heart of the trial court's Judgment. We find that the record contains substantial evidence supporting the trial court's findings that Father resides in the least restrictive environment necessary to prevent him from injuring himself and others, and also to provide him with appropriate care, habilitation and treatment. The record contains substantial testimony that Father would not be in his current physical and mental condition without the enforced sobriety provided through his residential care facility at Parc Provence. Evidence was introduced of the history of Father's alcohol dependency and abuse, Father's repeated failures relating to his alcohol dependency and abuse during times with fewer restrictions, Father's lack of understanding or unwillingness to acknowledge his need to refrain from alcohol consumption, the dire consequences that would occur if Father was given the opportunity to consume alcohol and failed again at retaining his sobriety, and Father's inability to manage his medical needs. Given the nature of the evidence presented, we find that the trial court was justified in finding that a living environment with fewer restrictions is more likely than not to cause injury to Father's health and well-being, if not his death. The record contains substantial evidence that retaining a guardian for Father is necessary for his continued positive participation in his second chance at life.

Daughter's appointment as Father's guardian and conservator instills with her a duty to determine Father's care, habilitation, and treatment in a manner that recognizes his dignity as an individual, and provides Father a sense of self-worth and participation in life. We recognize the difficulty in achieving this goal, and balancing the competing interests of allowing Father his freedom to choose how to live his life while simultaneously providing for Father's care and habilitation consistent with Daughter's statutory obligation as guardian. This inherent conflict places a tremendous challenge on Daughter who seeks to maintain a positive rather than resentful relationship with Father. While we acknowledge Father's pleas for fewer restrictions in his daily life, we cannot ignore the circumstances that first brought Father under the jurisdiction of the court, and the reasons that caused the trial court on two separate occasions to affirmatively decide to continue to exercise its jurisdiction over Father.

Our review of the record shows that Daughter's efforts at fulfilling her concurrent roles as guardian and conservator have been successful as Father finds himself in a remarkably improved physical and mental condition today than he was during his original trial in 2005. Despite Father's request to remove Daughter from the position of guardian and conservator, and his displeasure with his limited freedom to live life and pursue activities that make him happy, the evidence presented to the trial court demonstrates that Daughter's decisions regarding Father have been made with his best interest in mind. As guardian, Daughter is accorded substantial discretion in making decisions relating to Father's daily life and routine. The record shows that Daughter has considered a great deal of Father's history, as well as her obvious concern for his health and well being in making those decisions. The trial court properly rejected Father's request that it interject itself in the details of the day-to-day decisions made by Daughter, as such micro-management, without obvious reason to justify such interference, is contrary to the court's duty to acknowledge the discretion of the guardian.

Accordingly, acknowledging Daughter's discretion in fulfilling her role as Father's

guardian and considering the entire evidentiary record before us, we find that substantial evidence supports Daughter's continued appointment as Father's guardian to assure Father's placement in the best and least restrictive environment, assure his receipt of medical attention and other necessary care, and promote his comfort, safety, health and welfare. Section 475.120.3.

Further, evidence was presented that Daughter is discharging her duties and responsibilities as guardian as required by the probate code, and acting in the best interest of Father, according to Section 475.120. Father himself admitted that but for his placement at Parc Provence, he would not be in the improved condition he is in today.

Our standard of review requires us to consider the record in the light most favorable to the trial court's judgment. *T.B.G.*, 772 S.W.2d at 654. We will uphold the trial court's ruling, even if we may have ruled differently, so long as substantial evidence exists to support the trial court's judgment. *Estate of Schooler*, 204 S.W.3d at 344. We find substantial evidence exists to support the trial court's finding that Father is unable at this time to make health care decisions in his own best interest, and that he is unable to make competent decisions concerning his living circumstances, including his place of residence and restrictions relating to his use of alcohol. We agree with the trial court that Father also does not have the capacity to manage his own finances. The evidence before us supports the judgment of incapacity as to Father's physical and financial needs, and the continuation of a guardian

of his person, for Father's continued well-being. The trial court did not err in denying Father's petition to terminate the guardianship or remove Daughter as guardian because Father did not demonstrate by a preponderance of the evidence that he had insight into his alcoholism or that he had capacity to manage his daily essential needs. *See Werner*, 133 S.W.3d at 111–12.[6] Further, Father did not meet his burden of establishing Daughter's failure to fulfill her role as guardian and conservator, and substantial evidence exists to the contrary.

Father's second and third points are denied.

### III. Father's Right to Vote

■ In his last point, Father alleges that the trial court erroneously declared and applied the law in finding that he is not allowed to vote because the court has authority pursuant to Section 475.078 to order that a person adjudged incapacitated shall retain the right to vote.

Article 8, Section 2 of the Missouri Constitution provides that "no person who has a guardian of his or her estate or person by reason of mental incapacity, appointed by a court of competent jurisdiction . . . shall be entitled to vote . . ." Additionally, Section 115.133.2 provides that "[n]o person who is adjudged incapacitated shall be entitled to register to vote."

The trial court's judgment cited Section 115.133 as its reason that Father should not be allowed to vote. Father argues on appeal that this section must be read in conjunction with Section 475.078.1, which

---

6. Given the extensive evidence of Father's alcohol abuse, repeated failures with alcohol in less restrictive living environments, Father's mental impairment that accompanied such abuse, and Father's current medical conditions, we also do not agree that Daughter would be acting in Father's best interest by allowing him the opportunity to have unfettered access to alcohol, or to otherwise provide a living environment that would allow Father to begin again the downward spiral of alcohol abuse.

states, "An adjudication of partial incapacity or partial disability does not operate to impose upon the ward or protectee any legal disabilities provided by law except to the extent specified in the order of adjudication ..." and with subsection 3, which further states, "The court, at any time after a hearing on the question, may determine that an incapacitated ... person is incompetent for some purposes and competent for other purposes." Sections 475.078.1, 475.078.3. Father argues that the case of *Hugenel v. Estate of Keller,* 867 S.W.2d 298, 303 (Mo.App. S.D.1993), demonstrates that a person may be incapacitated for one physical purpose but not for the mental purpose of capacity to make a valid will.

█ Where language of a statute is clear and unambiguous, there is no room for construction, and we must give effect to the language as written. *Hunt v. Dir. of Revenue,* 10 S.W.3d 144, 149 (Mo.App. E.D.1999). The plain language of both Article 8, Section 2 of the Missouri Constitution and Section 115.133 is clear and unambiguous. Each provision precluded the trial court from entering an order allowing Father to vote. Neither provision provides for any exception. The prohibition set forth in each provision is absolute. We recognize the discussion in *Hugenel* in which the Southern District agreed that it was possible for a person under guardianship to have sufficient testamentary capacity to make a will. *Id.* In reaching this conclusion, the *Hugenel* court analyzed the general rule as set forth in 79 Am.Jur.2d Wills § 58, that guardianship does not automatically deprive a person of his testamentary capacity but an adjudication of incompetence may be prima facie evidence of testamentary incapacity, in light of the presumption of incompetence under Section 475.078(3). *Id.* However, unlike the issue of testamentary capacity, Father's petition to restore his right to vote cannot be resolved by presenting evidence attempting to overcome a presumption of incompetence under Section 475.078(3). While we acknowledge Father's desire to vote and the unique circumstances leading to the initial finding of incapacity and the continuation of that incapacity, neither Article 8, Section 2 of the Missouri Constitution nor Section 115.133 provides for any such redress. The trial court properly interpreted and applied the law in denying Father's request because both the constitutional and statutory prohibitions provide no exception or procedure by which an incapacitated person may regain the right to vote without the removal of his incapacity. Father has cited no case law, and we are aware of none, in which Section 475.078(3) has been applied to overcome the prohibitions of Article 8, Section 2 of the Missouri Constitution and Section 115.133.

The trial court did not erroneously declare or apply the law in failing to grant Father's request that he be allowed to vote. There is no substantial evidence to support an opinion different from that of the trial court. *In re Estate of Haan,* 237 S.W.3d at 233. Father's fourth point is denied.

*Conclusion*

The judgment of the trial court is affirmed.

KENNETH M. ROMINES, C.J., and GEORGE W. DRAPER, III, J., concur.